**Franklin A. HAMM, Richard L. Weiher,**
and
**Minnesota Mining and Manufacturing Company, Plaintiffs,**

v.

**Edward J. BRENNER, Commissioner of Patents, Defendant.**

**Civ. A. No. 1060–64.**

United States District Court
District of Columbia.

July 1, 1965.

Ellsworth H. Mosher, Washington, D. C., Cruzan Alexander, James A. Smith, Carpenter, Abbott, Coulter & Kinney, St. Paul, Minn., for plaintiffs.

Clarence W. Moore, Sol., U. S. Patent Office, Washington, D. C., for defendant.

JACKSON, District Judge.

This action came on for trial on February 18, 1965. Upon due consideration of the evidence presented, together with the briefs counsel were accorded an opportunity to file, the Court has found in favor of the defendant and will order that the Complaint be dismissed.

Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court states its Findings of Fact and Conclusions of Law separately as follows:

## FINDINGS OF FACT

1. This is an action under 35 U.S.C. § 145 in which plaintiffs seek an order from the Court authorizing defendant to grant them a patent containing claims 3 to 6, 8, 9, and 14 of an application for patent Serial No. 848,219, filed October 23, 1959, entitled "Novel Photosensitive Sheets, The Preparation and Use Thereof". Seven other claims were allowed in the application.

2. Claims 4 and 8 are illustrative of the claimed subject matter, and read as follows:

4. A copysheet having an $i_{30}/i_d$ ratio of at least about 2.5 and being essentially incapable of building up and maintaining a surface charge which comprises a coating of indium oxide and an organic polymeric bind-

er on a contiguous electrically conductive backing.

8. A method for preparing a copysheet having an $i_{30}/i_d$ ratio of at least 2.5 and being essentially incapable of building up and maintaining a surface charge which comprises intimately mixing by extended ball milling photoconductive indium oxide powder and an organic polymeric binder in a volatile solvent media, and coating the resultant suspension onto an electrically conductive backing.

3. As defined in the specification, the $i_{30}/i_d$ ratio represents the increase in current passing through the coating, after a thirty second exposure to a given illumination, divided by the initial current passing through the coating in the dark. This ratio is a measure of the photoconductivity of the copysheet. For ratios above 2.5, electrolytic development of an exposed copysheet was found possible. Passage of a current under moderate voltage through the exposed copysheet served to reduce the indium oxide to indium metal in light-struck areas, thus yielding a negative. This is said to be an advantage over certain other copysheets, which require special plating solutions for electrolytic development. Prolonged ball milling, in the method illustrated by claim 8, gives rise to increasing $i_{30}/i_d$ ratios, and also to increasing dark resistivity for the coating.

4. The prior art relied upon by the Patent Office is listed as follows:

Goldman (Br.) 464,112 Apr. 12, 1937

Smart 2,423,624 July 8, 1947

Sugarman et al. 2,862,815 Dec. 2, 1958

Johnson et al. 3,010,883 Nov. 28, 1961
(Filed Mar. 30, 1956)

Johnson et al. 3,010,884 Nov. 28, 1961
(Filed Oct. 28, 1957)

Middleton et al. 3,121,006 Feb. 11, 1964
(Filed June 26, 1957)

Wainer—1952 Photographic Engineering, Vol. 3, No. 1, pp. 12 and 13.

5. The more pertinent references are Sugarman et al., Johnson et al. ('884) and Middleton et al.

Sugarman et al. disclose copysheets for electrostatic or xerographic development. They mix photoconductive powder with a resinous binder and solvent in a ball mill, and then coat the resultant suspension on a backing sheet which may be of electrically conductive material. As examples of possible photoconductors, the patentees suggest "the colored oxides, sulphides, selenides, tellurides, and iodides of cadmium, mercury, antimony, bismuth, thallium, indium, molybdenum, aluminum, lead, and zinc". They also disclose a range of ingredient proportions embracing that claimed by plaintiffs.

Johnson et al. ('884) disclose a copysheet having zinc oxide as the photoconductive material, dispersed in a binder. The patentees report having successfully developed such a copysheet both electrolytically and electrostatically. They state that "Development has been carried out electrolytically with copy sheets having a photoconductivity value * * * as low as about $10^{-7}$ mho/cm". They then say "In all cases, the conductivity values under dark conditions must not be higher than about one-twentieth of the photoconductivity value for best results in terms of electrolytic image-development". Assuming in view of the latter that the $10^{-7}$ mho/cm. value pertains to illuminated conductivity, the dark conductivity might well be in the order of $10^{-8}$ mho/cm. This means that electrostatic development was found possible with dark resistivity for the coating as low as about $10^8$ ohm-cm. The patentees' method of making the copysheet is similar to plaintiffs', an 8 hour ball milling time being reported.

Middleton et al. disclose many photoconductive materials for electrostatically developable copysheets, including several of the compounds suggested by Sugarman et al. above. The patentees reveal that the minimum dark resistivity for a homogeneous layer of photoconductor is generally in the order of $10^{12}$ ohms-cm., but that the dark resistivity requirement

for the photoconductive insulator are not nearly so strict where it is incorporated in an insulating binder. For the latter, they indicate that the composite resistivity of the binder and photoactive material in the layer should be at least $10^{10}$ ohms-cm. Where the photoconductor has low resistivity, it is suggested that a binder be used having a compensatingly high resistivity, lest the composite layer be unable to hold an electrostatic charge in the dark. The only reference to indium oxide is for use thereof as a coating for glass, serving as a conductive backing for a composite layer of photoconductor dispersed in a binder. The preparation of the composite layer is again similar to plaintiffs', with ball milling periods up to 17 and 21 hours for some examples.

6. The Examiner and the Board of Appeals found that the differences between the subject matter of claims 3 to 6, 8, 9, and 14, and that of the prior art would have been obvious at the time the invention was made to a person ordinarily skilled in the art. 35 U.S.C. § 103. The Examiner and Board of Appeals held that the Sugarman et al. patent suggested employing indium oxide as the photoconductive material in a copysheet for electrostatic development. The Court cannot say that finding was unreasonable. Contrary to plaintiffs' contention, successful use of indium oxide in a composite layer for electrostatic development would seem possible, at least on the basis of the evidence here. While indium oxide appears to be one of the more conductive photoconductors for use in electrostatically developable copysheets, one skilled in the art would realize that a compensatingly highly resistive binder might be employed. Middleton et al. teach as much, in addition to indicating that a dark resistivity of $10^{10}$ ohm-cm. would suffice for the composite layer. In that respect, Johnson et al. ('884) indicate that an even lower dark resistivity might be developable electrostatically.

7. At trial, plaintiffs' expert witness testified that "In electrostatic photography, it is usually required that the ratio of the conductivity after illumination to the conductivity before illumination be on the order of a hundred to a thousand". At such large values, the indicated ratio is virtually the same as the $i_{30}/i_d$ ratio defined by plaintiffs. Hence, it is fair to assume that the electrostatic copysheets suggested by Sugarman et al. would satisfy the minimal values of 2.5 and 20 for $i_{30}/i_d$ recited in the claims.

8. The Court agrees with the Board of Appeals that the copysheet claims are not patentably distinguishable over Sugarman et al., by virtue of the negative limitation that the copysheet is "essentially incapable of building up and maintaining a surface charge." By this, plaintiffs mean that the resistivity of the copysheet is too low for electrostatic development. However, as previously noted, the threshold dark resistivity for electrostatic development may be as low as $10^{10}$ ohm-cm., or possibly even as low as $10^8$ ohm-cm. as in the case of Johnson et al. ('884). The latter value is virtually the same as that attained by plaintiffs for their maximum milling time, as disclosed in their specification. No upper limit for dark resistivity and/or milling time was actually disclosed. Hence, resort to the specification cannot cure the fundamental indefiniteness of this claim limitation. Like the Board of Appeals, the Court does "not see that appellants have shown that the claimed copysheet's conductivity characteristics make it significantly distinct from the copysheet disclosed by Sugarman et al.

9. The basic method recited in claims 8 and 9 is disclosed in each of Sugarman et al., Johnson et al. '884 and Middleton et al. To apply it to any selected photoconductive material would be obvious. While Sugarman et al. specify no particular milling time, Johnson et al. indicate 8 hours and Middleton et al. up to 17 and 21 hours. These would seem to be extended periods, in view of testimony by one of the co-applicants here that two hours is normally sufficient for uniform dispersement of the photoconductor in the binder. The minimal 72 hours mill-

ing time specified in claim 9 was not disclosed as critical nor shown by evidence to be critical. In this regard, the Court agrees with the Board that "Such considerations as the weight, composition, or size of balls, speed of rotation, viscosity and density of polymeric binder solution, etc., would make the specified ball-milling time a dubious and variable measure of the dispersing and comminuting effect."

### CONCLUSIONS OF LAW

1. For patentability, claims to structure must distinguish over the prior art in terms of physical differences, rather than mere properties or characteristics, such as electrical conductivity, or inability to maintain a surface charge, In re Dalton, 188 F.2d 170, 38 CCPA 953.

2. Claims 3 to 6, 8, 9 and 14 are unpatentable.

3. The Complaint should be dismissed.