The **BARR RUBBER PRODUCTS COMPANY, Plaintiff,**

v.

The **SUN RUBBER COMPANY, Defendant.**

United States District Court
S. D. New York.
March 9, 1966.

Ely, Golrick & Flynn, Cleveland, Ohio, Darby & Darby, New York City, for plaintiff; Albert L. Ely, Jr., Cleveland, Ohio, and Harvey M. Brownrout, New York City, of counsel.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, Hamilton & Cook, Akron, Ohio, for defendant; Thomas F. Reddy, Jr., New York City, Everett R. Hamilton, Cleveland, Ohio, and James G. Foley, New York City, of counsel.

FEINBERG, District Judge.

In November 1960, plaintiff, The Barr Rubber Products Company ("Barr"), brought an action seeking a declaration that a patent owned by defendant, The Sun Rubber Company ("Sun"), is invalid. The patent in question is United States Molitor patent No. 2,629,134 ("the Molitor patent"). In its complaint and counterclaim, Barr also alleges unfair competition and antitrust violations for which it seeks damages and injunctive relief.[1] In two counterclaims, Sun asks for a declaration that its patent is valid and has been infringed and seeks equitable relief and damages for patent infringement, alleged antitrust violations and unfair competition. After discovery had been completed and a tentative trial date had been set, and while the pretrial order was being worked on, Barr brought the instant motion for summary judgment based upon facts uncovered only in the last stages of discovery.[2] Barr's motion raises only one of the many asserted deficiencies in the Molitor patent. The motion is based on 35 U.S.C. §§ 181, 184, and 185, provisions enacted to protect national security by requiring, under certain circumstances, authorization from the Commissioner of Patents ("the Commissioner") before filing patent applications abroad. Barr asserts that an unauthorized filing in Canada in 1950 invalidates the Molitor patent.

The undisputed facts are these: The application for a United States patent was filed on June 27, 1950, in the name of Robert T. Molitor (patent application serial No. 170,515) for a "Method of Manufacturing Articles from Vinyl Resins."[3] The patent was not issued until February 24, 1953. However, pursuant to a standing order of the Commissioner,[4] a license was immediately issued to the applicant, attached to the back of the application receipt.[5] This license in essence authorized the applicant to file a similar application in foreign countries after sixty days had elapsed, providing no secrecy order had been issued during the interim. Contrary to the terms of the license, Sun filed its Molitor patent application in Canada on August 18, 1950, after only fifty-one days had passed. Apparently, Sun learned of this license violation only recently when Barr declared its intention to attack the patent's validity on that ground

1. Barr originally also sued Wonder Products Company. In May 1965, Wonder was dropped as a defendant. In August 1965, Barr's motion to join McNeil Corporation and B. F. Goodrich Company as defendants was denied.

2. This hotly contested litigation was assigned for all purposes to the writer of this opinion in December 1964, after over 6,000 pages of deposition testimony had been taken. Since then, plaintiff has brought no less than 9 motions, including an application to take 19 additional depositions, which was granted. See Memorandum Opinion, Aug. 11, 1965 at 3.

3. Barr's Motion for Summary Judgment, Exhibit ("Ex.") A.

4. Id., Ex. C (Commissioner of Patents, Order No. 4025, Jan. 31, 1946, U.S. Patent Office Official Gazette 539 (Feb. 26, 1946)).

5. See Sun's Memorandum Opposing Motion ("Mem. Opp."), p. 6.

and thereafter filed this motion for summary judgment on October 22, 1965. Taking immediate steps, on October 26, 1965, Sun petitioned the Commissioner to issue a retroactive license authorizing the Canadian filing.[6] The same day, after an ex parte proceeding, the Commissioner issued the requested license retroactively authorizing the filing of the application in Canada as of August 16, 1950, two days before it actually was filed there.[7] Thereafter, Barr petitioned the Commissioner early in January 1966 (1) to establish a procedure by which Barr could present its views as to whether the Commissioner should reconsider the grant of the retroactive license, and (2) to issue a written decision disclosing the basis on which the license was granted.[8] On February 2, 1966, Barr's petition was denied. Barr's motion for summary judgment in this court was thereafter renewed.

In support of its motion, Barr makes the following arguments: (1) The Commissioner no longer has jurisdiction to issue a retroactive license allowing a foreign application after the claimed invention has received a United States patent. (2) Even assuming the Commissioner retains the power to issue such a retroactive license, he may do so only where a foreign filing does not violate the terms of a license already granted. (3) The Commissioner issued the retroactive license under a law no longer in existence. (4) The retroactive license should not have been granted because Sun made a legally insufficient showing of "inadvertence" as its excuse for filing prematurely.[9] These arguments will be taken up in order.

## I

Barr's first contention is the most substantial. It maintains that 35 U.S.C.

§§ 184, 185, when read together and considered in the light of predecessor provisions, restrict the Commissioner's authority to issue retroactive licenses to the period while a United States application is still pending. In this case, that period extended only from June 27, 1950, the date of the Molitor patent application, to February 24, 1953, the date the patent issued. Barr contends that after issuance of a patent the matter has egressed forever from the Commissioner's administrative jurisdiction. Sections 184 and 185 provide:

§ 184. Filing of application in foreign country

Except when authorized by a license obtained from the Commissioner a person shall not file or cause or authorize to be filed in any foreign country prior to six months after filing in the United States an application for patent or for the registration of a utility model, industrial design, or model in respect of an invention made in this country. A license shall not be granted with respect to an invention subject to an order issued by the Commissioner pursuant to section 181 of this title without the concurrence of the head of the departments and the chief officers of the agencies who caused the order to be issued. The license may be granted retroactively where an application has been inadvertently filed abroad and the application does not disclose an invention within the scope of section 181 of this title.

The term "application" when used in this chapter includes applications and any modifications, amendments, or supplements thereto, or divisions thereof.

6. Id., Ex. A.

7. Id., Ex. B.

8. Petition under Rule 182, filed by Barr with the Commissioner.

9. Barr also claims that whether Sun's premature filing was inadvertent (see 35 U.S.C. § 184) is a fact in dispute. This objection to the issuance of a retroactive license is not the proper subject of a motion for summary judgment; hence it has not been considered in this opinion.

§ 185.  Patent barred for filing without license

Notwithstanding any other provisions of law any person, and his successors, assigns, or legal representatives, shall not receive a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring the license prescribed in section 184 of this title, have made, or consented to or assisted another's making, application in a foreign country for a patent or for the registration of a utility model, industrial design, or model in respect of the invention.  A United States patent issued to such person, his successors, assigns, or legal representatives shall be invalid.

These provisions are the most recent of a series of statutes requiring permission by license to file patent applications abroad.  The pre-World War II acts contained no retroactive licensing provisions.[10]  Nevertheless, the Commissioner issued retroactive licenses even after patents had issued.[11]  In 1946, section 6 of the Boykin Act [12] became law, specifically saving patents from invalidation because of unauthorized foreign filing if "the Commissioner subsequently authorized the filing of the application * * *."  In re Lee, 77 U.S.P.Q. 659 (Comm'r of Patents 1948), held that the Commissioner had power to continue granting post-patenting retroactive licenses.  The Invention Secrecy Act of 1951 [13] repealed the earlier foreign filing statutes and substituted section 184, which less clearly deals with the Commissioner's power to grant a retroactive license after a patent has issued.  Recently there has been a spate of cases dealing with the issue posed by Barr; the weight of authority is clearly contrary to its position.  Pillsbury Co. v. General Mills, Inc., 252 F.Supp. 747 (D.Minn. 1966); Nordberg Mfg. Co. v. Jackson Vibrators, Inc., Civil No. 63–2250, N.D. Ill., Jan. 10, 1966 (opinion in form of letter to counsel); Pillsbury Co. v. Brenner, 146 U.S.P.Q. 99 (D.D.C.1965) (connected case); Blake v. Bassick Co., 146 U.S.P.Q. 157 (N.D.Ill.1963) and 245 F. Supp. 635 (N.D.Ill.1965); Engelhard Indus., Inc. v. Sel-Rex Corp., 145 U.S.P. Q. 319, 324 (D.N.J.1965); Davidson Rubber Co. v. Sheller Mfg. Corp., 248 F.Supp. 842 (S.D.Iowa 1965); McCulloch Motors Corp. v. Oregon Saw Chain Corp., Civil No. 919–57–PH S.D.Cal., Central Div., June 29, 1963, reproduced in Mem.Opp. Ex. E (dictum); see McCormick v. Brenner, 146 U.S.P.Q. 340 (D.D.C.1965); In re Rinker & Duva, 145 U.S.P.Q. 156 (Comm'r of Patents 1964).  Contra, Minnesota Mining & Mfg. Co. v. Norton Co., 240 F.Supp. 150 (N.D.Ohio 1965).

For purposes of discussion, it may be helpful first to examine the *3M* litigation since it contains an analysis of key considerations and is Barr's sole judicial support.  Plaintiff Minnesota Mining & Mfg. Co. had filed an application for patent with the United States Patent Office in 1958.[14]  Less than six months thereafter, without any license, plaintiff filed the same application in five foreign countries.  In 1959, the Patent Office did issue a license permitting foreign filing, but not a retroactive one, and a patent issued in 1960.  Thereafter, plaintiff brought an infringement suit against Norton Co.  Defendant moved for summary judgment on the ground that plaintiff's unlicensed foreign filing violated 35 U.S.C. § 184 and invalidated the patent *ab initio* un-

---

10.  Ch. 95, 40 Stat. 394 (1917), amended, ch. 501, 54 Stat. 710 (1940), added by ch. 392, 55 Stat. 656 (1941), extended for duration of war, ch. 415, 56 Stat. 370 (1942).

11.  See report on § 6 of the Boykin Act, 60 Stat. 943 (1946), H.R.Rep. No. 1498, 79th Cong., 2d Sess. (1946), reprinted in 1946 U.S.Code Cong. & Ad. News ("H. Rep. No. 1498") 1491 at 1496.

12.  60 Stat. 943 (1946).

13.  35 U.S.C. §§ 181–188.

14.  Plaintiff was actually the assignee of the original applicant.

der 35 U.S.C. § 185. The court agreed.[15] Thereafter, plaintiff secured a retroactive license from the Commissioner and sought reconsideration of the court's order. Denying the motion, the court held that once the Commissioner issued a patent he no longer had jurisdiction to issue a retroactive license, and that therefore plaintiff's patent remained invalid. Minnesota Mining & Mfg. Co. v. Norton Co., 240 F.Supp. 150 (N.D. Ohio 1965).

Chief Judge Connell reasoned as follows: Traditionally, the courts and not the Patent Office have had jurisdiction to affect or control patents after their issuance; the few legislative exceptions giving the Patent Office continuing power over issued patents have been strictly confined to their terms by the courts. One such exception was the Boykin Act's express provision [16] that the Commissioner could issue a retroactive license authorizing prior foreign filing and thereby validate patents already issued as well as patents yet to be issued. But the present provision (35 U.S.C. § 184) does not expressly provide for retroactive licensing of patents; rather, it speaks only of applications. Moreover, section 185 provides that persons who file abroad without a license "shall not receive a United States patent," further implying that any license for foreign filing—retroactive or not—must be granted before a patent issues, or else not at all. The difference between section 6 of the Boykin Act and the present provisions is that the former, which extended Patent Office jurisdiction, was a temporary law, "a product of exigency necessary to facilitate postwar recovery without working unjust results on inventors hampered by war-time communication problems." (240 F.Supp. at 154). Removal from section 184 of the express

jurisdiction Congress had extended in the prior act is inferred from a committee report to have been one of " 'several changes recognized as desirable as a result of experience under the temporary law and problems anticipated under a permanent law.' " [17]

The *Minnesota Mining* case is a minority view, and at least seven other judges have disagreed with its reading of sections 184 and 185. This opposing judicial interpretation was succinctly put in Blake v. Bassick Co., 146 U.S.P.Q. 157 (N.D.Ill.1963) and 245 F.Supp. 635 (N.D.Ill.1965). In *Blake*, plaintiffs were the owner and licensee of a patented furniture leveling device. Defendants moved for summary judgment twice on the ground that the patent had been voided by the premature filing of a related application in Great Britain. In his 1963 decision, Judge Robson orally denied the motion on the ground that there remained genuine issues of fact, but in a strong dictum indicated his conclusion that the Commissioner had power to grant a retroactive license even after he had issued the related patent. Sometime later, defendants renewed their summary judgment motion, relying largely on the intervening decision in *Minnesota Mining*. This time the court denied the motion in a holding explicitly ruling on the foreign filing issue. Judge Robson apparently accepted the basic premise of *Minnesota Mining* [18] that in the absence of specific congressional authorization the Commissioner is powerless to affect the validity or invalidity of a patent after it is issued. But, disagreeing with *Minnesota Mining*, Judge Robson, in the second *Blake* decision, found that:

> [E]xpress Congressional authorization in Section 184 gives the right to grant retroactive licenses, and Sec-

15. Minnesota Mining & Mfg. Co. v. Norton Co., 144 U.S.P.Q. 272 (N.D.Ohio 1965).

16. Section 6, 60 Stat. 943 (1946).

17. 240 F.Supp. 155, quoting S.Rep. No. 1001, 82d Cong., 2d Sess. (1952), reprint-

ed in 1952 U.S.Code Cong. & Ad.News ("S.Rep. No. 1001") 1321.

18. Minnesota Mining & Mfg. Co. v. Norton Co., 240 F.Supp. at 155, quoted in Blake v. Bassick Co., 245 F.Supp. at 637 (second decision).

tion 185 refers to the license prescribed in Section 184. One such license prescribed by Section 184 is the retroactive license.[19]

Examining the meager legislative history behind sections 184 and 185, Judge Robson concluded that Congress did intend to continue in the present act the Patent Office jurisdiction it had created in section 6 of the Boykin Act. Accordingly, a retroactive license insulated the patent from attack because of inadvertent filing abroad, and defendants' motion for summary judgment was denied.

The issue was also raised in Pillsbury Co. v. General Mills, Inc., 252 F.Supp. 747 (D.Minn.1966). In that case, the patent application in question was filed in the Patent Office in April 1961. Without a license to do so and within six months (and therefore in violation of 35 U.S.C. § 184), plaintiff Pillsbury filed an application in Canada. A patent was issued to plaintiff in June 1963 on its United States application. In May 1965, apparently discovering for the first time that its filing abroad had been improper, plaintiff petitioned the Commissioner for a license under 35 U.S.C. § 184 to validate retroactively the Canadian application. Because of conflicting judicial decisions,[20] the Commissioner declined to grant the license. Plaintiff Pillsbury therefore brought an action against the Commissioner in the United States District Court for the District of Columbia for a declaration that the Commissioner had authority to grant a retroactive license relating to an issued patent. That court held that the Commissioner could issue such a license.[21] Pillsbury then again requested a retroactive license from the Commissioner, and one was granted. Plaintiff Pillsbury thereafter argued before Judge Nordbye, in re-

sponse to defendant's motion to dismiss plaintiff's suit, that the retroactive license cured any defects in its patent.

In denying defendant's motion, the court squarely disagreed with the reasoning and holding of *Minnesota Mining*; specifically, it rejected that opinion's reading of the legislative history of 35 U.S.C. §§ 184, 185 and characterized that court's view as contrary to "the clear weight of authority."[22] In response to defendant's argument that a patent once lost cannot be resurrected by the Commissioner, the court stated (252 F.Supp. at 748):

> Realistically, moreover, this patent never entered the public domain under Section 185 until it was established that the patentee had violated Section 184. In other words, the invalidity of this patent never was affirmatively established before plaintiff had procured the required license from the Commissioner which was granted retroactively to a date prior to the alleged violation of Section 184. If there is an apparent inconsistency in granting a retroactive license under Section 184 when Section 185 provides that under the circumstances herein a person shall not receive a patent, and if issued, it shall be invalid, that inconsistency was no doubt recognized by the District Court of the District of Columbia when it held that regardless of the issuance of Patent No. 3,308,-808, the Commissioner was authorized to issue a retroactive license if the Canadian application had been made inadvertently.

The court also rejected the argument (not made here by Barr) that the only purpose a retroactive license could serve would be to relieve a violator of 35 U.S.C. § 185 from the criminal penalties of

19. 245 F.Supp. at 637.

20. The opinions referred to were Minnesota Mining & Mfg. Co. v. Norton Co., 240 F.Supp. 150 (N.D.Ohio 1965), and Engelhard Indus., Inc. v. Sel-Rex Corp., 145 U.S.P.Q. 319 (D.N.J.1965).

21. Pillsbury Co. v. Brenner, 146 U.S.P.Q. 99 (D.D.C.1965).

22. Pillsbury Co. v. General Mills, Inc., 252 F.Supp. at 749.

35 U.S.C. § 186.[23] Accordingly, the court held that the Commissioner had power to issue the retroactive license and that the patent was valid.[24]

The almost unanimous course of decisions might of itself be sufficient to dispose of Barr's motion. However, apparently no appellate court has ruled on the issue as yet and it is substantial enough to warrant further analysis. In the absence of a clear statement of legislative intent in congressional hearings or reports, the courts, and counsel in the present case, have resorted to intricate internal linguistic analysis. The last sentence of the first paragraph of section 184 states:

> The license may be granted retroactively where an application has been inadvertently filed abroad and the application does not disclose an invention within the scope of section 181 of this title.

Having noted that the Boykin Act expressly authorized retroactive licensing subsequent to the issuance of a patent, the court in *Minnesota Mining* observed that the last portion of the language quoted above

> permits a retroactive license to issue only when the *application* discloses no harmful information; if Congress had intended to extend the Patent Office jurisdiction beyond its normal administrative reaches, it would have in-

cluded the phrase "or patent" after "application." * * * Without the inclusion of such language, however, we detect nothing here which permits the Patent Office to assert itself over an application which has already ripened into a purported patent.[25]

Regarding as erroneous the assumption that "application" referred to a domestic, rather than a foreign, filing, the court in Pillsbury Co. v. General Mills, Inc. characterized this conclusion as having led the *Minnesota Mining* court "astray."[26] The first *Blake* decision agreed that this was an erroneous reading and that Congress intended "application" to refer to the foreign application, stating:

> [T]he word "application" is used when speaking of the foreign application, as is understandable, in that the U.S. Government was seeking to prevent any disclosure of an invention to a foreign nation before this country had decided whether it wanted to preempt the invention.
>
> Congress undoubtedly used the word "application" advisedly, not in contradistinction to "patent"—national security was to be preserved by prohibiting disclosure not by prohibiting foreign patenting.[27]

In this case, Barr rejoins in defense of the *Minnesota Mining* interpretation

---

23. § 186. Penalty

Whoever, during the period or periods of time an invention has been ordered to be kept secret and the grant of a patent thereon withheld pursuant to section 181 of this title, shall, with knowledge of such order and without due authorization, willfully publish or disclose or authorize or cause to be published or disclosed the invention, or material information with respect thereto, or whoever, in violation of the provisions of section 184 of this title, shall file or cause or authorize to be filed in any foreign country an application for patent or for the registration of a utility model, industrial design, or model in respect of any invention made in the United States, shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than two years, or both.

24. Accord, district court cases cited at p. 15, supra. See also In re Rinker & Duva, 145, U.S.P.Q. 156 (Comm'r of Patents 1964), in which the Patent Office stated that it customarily granted retroactive licenses under section 184 even after the relevant patent had issued, but significantly added: "Whether or not the granting of such a license could serve to validate a patent which had been issued before the license was granted is, of course, a matter for determination by the courts."

25. Minnesota Mining & Mfg. Co. v. Norton Co., 240 F.Supp. at 155 n. 4.

26. 252 F.Supp. at 749.

27. 146 U.S.P.Q. at 160 (dictum).

with a counter-argument: [28] Admittedly, in the last sentence of the first paragraph of section 184, the first occurrence of "application" refers to the foreign application. But, says Barr, in its second occurrence "application" refers to the initial United States application, and here the word is used in contradistinction to "patent," as Judge Connell concluded.

Having weighed the arguments and authorities cited by counsel, I certainly agree with Judge Robson that "it must be conceded that there is some ambiguity in Congressional intent * * *." [29] Nonetheless, it seems reasonably clear that section 184 authorizes the Commissioner to issue a retroactive license even after a patent has issued. There are several reasons for this conclusion. First, the initial use of the word "application" in the last sentence of the first paragraph of section 184 clearly means an application in a foreign country, since the word is modified by "filed abroad." As to the meaning of "application" in its second occurrence in that sentence, it seems more probable that the same word used twice in the same sentence has the same meaning in each case. This requires rejection of the argument that "application" means a domestic application, and moreover was intended as a term in contradistinction to "patent." Barr also relies on the direction in section 185 that a person who files without authorization "shall not receive" a patent, and that a "patent issued to such person * * * shall be invalid." The first directive, of course, prevents the Commissioner from issuing a patent if he knows that a heretofore unauthorized unlicensed foreign filing has occurred. But without question at that stage the Commissioner may grant a retroactive license and thereafter issue the patent. The second command of section 185 obviously deals with the situation where the Commissioner issues the patent ignorant of a previous unauthorized filing abroad. Barr's contention is that by decreeing in the last sentence of section 185 that any patent issued "such person" shall be invalid, the legislature meant "such person" to refer to one who had not procured a license by the date the patent issued. [30] On the basis of linguistic analysis alone, it is at least equally probable that no such intention was held by the legislature; in other words, that "such person" refers broadly to one who has not procured a license at any time, and does not more narrowly refer to one who has failed to get a license by the time the patent issues. It is unlikely that Congress intended to invest the statutory terms with such subtle meanings now discovered years later by skillful counsel. Thus, to recapitulate, I believe that internal analysis of sections 184 and 185 does not support Barr's position that the Commissioner may not grant a retroactive license after a patent to which it relates has issued.

Several further considerations weigh against Barr. First of all, such legislative history as the court has been able to uncover suggests that with respect to the Commissioner's authority to issue retroactive licenses, the framers of the current act did not intend to change the substance of section 6 of the Boykin Act—except to make explicit [31] the requirement that a showing of inadvertent filing be made by the licensee. It is true that the substantially identical Senate and House reports of the Invention Secrecy Act of 1951 state that this act transforms the temporary wartime legis-

---

28. Barr's Reply Brief, pp. 8–11.

29. Blake v. Bassick Co., 245 F.Supp. at 638 (second decision).

30. Barr's Reply Brief, p. 10.

31. Although § 6 of the Boykin Act did not in terms require the petitioner for a retroactive license to show inadvertence, evidently that statute was not meant to license willful violation of the licensing provisions. See discussion of § 6 in H. Rep. No. 1498, U.S.Code Cong. & Admin. News 1946, at 1496. This was apparently also the Commissioner's interpretation. See In re Lee, 77 U.S.P.Q. 659 (Comm'r of Patents 1948).

lation into permanent law, "with several changes." [32] However, I respectfully disagree with Judge Connell's view [33] that one change Congress made was to remove some of the Patent Office's retroactive licensing jurisdiction. It seems more likely that the substantive changes the reports refer to are of other parts of the act, since the reports go into some detail on changes which clearly were made, but in contrast, in the paragraph devoted to what are now sections 184 and 185, the reports allude to no substantial alteration of this portion of the prior act. [34]

It may be contended that the rule adopted here makes it unclear whether a patent is valid or not; a court might declare it invalid for want of license, and then the Commissioner could breathe life into it by issuing a retroactive license. That, of course, is not the case before the court, nor is it likely to occur frequently (although concededly it could have occurred in *Minnesota Mining* on the motion for reconsideration). In most cases, as here, the retroactive license will be issued—if it is issued—between the time this ground of invalidity is raised in a court and decision on its merits is handed down—especially if the patent owner requests a stay to apply for his license. Moreover, any uncertainty would exist only for a limited period—the time it takes to secure a retroactive license, and if that is secured, to obtain a ruling from the court where the patent is under attack.

Finally, I have given weight to the interpretation the Commissioner has given section 184. His day to day experience in administering this and numerous other sections of the patent code entitles his opinion on its interpretation to serious consideration in deciding matters such as this. [35] It has been the Commissioner's almost continuous practice to grant retroactive licenses under section 184 even after patents have issued. [36]

In summary, with the exception of the *Minnesota Mining* case, all the precedents support the position that the Commissioner has the power to issue a retroactive license after a patent has issued and that, if he does, the original unauthorized filing abroad is no longer a basis for attacking the patent. I adopt this rule. I reject the rigid alternative which, in this case, would require destruction of a patent issued over thirteen years ago because of an application filed nine days too soon by oversight. Such a harsh result is not required by the language of the statute or its legislative history. Moreover, the construction of 35 U.S.C. §§ 184, 185 adopted here does not offend the policy of the Invention Secrecy Act. Presumably, if a foreign filing did compromise national security, no retroactive license would be granted, and the patent would be invalid. Accordingly, Barr's argument that the Commissioner was without power to issue a retroactive license fails.

## II

Barr's remaining arguments are less weighty. Thus, it contends that it was improper for the Commissioner to issue a retroactive license to a patentee who has filed an application abroad in contravention of the terms of a license he had initially been given. In this case, Sun originally received a license permitting foreign filing to begin sixty days later, but filed abroad after fifty-one. [37] Barr's point is that violation of a previously issued license is more serious than

---

32. S.Rep. No. 1001, U.S.Code Cong. & Admin. News 1952 at 1321.

33. See text accompanying note 17 supra.

34. S.Rep. No. 1001, U.S.Code Cong. & Admin. News 1952, at 1321–1324.

35. See SEC v. Chenery Corp., 332 U.S. 194, 209, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); Blake v. Bassick Co., 146

U.S.P.Q. 157, 160 (N.D.Ill.1963). (dictum)

36. See In re Rinker & Duva, 145 U.S.P.Q. 156 (Comm'r of Patents 1964), discussed in note 24 supra; cf. text at note 20 supra.

37. See text at notes 3–7 supra.

the simpler situation where no prior license has been issued. But whether an applicant filed abroad improperly because he had no license or instead because he disobeyed the terms of a license he already possessed is immaterial. What alone is material under the statutory provision is whether he filed abroad inadvertently. A person may do something by oversight or other accident, i. e., "inadvertently," [38] even when he has notice or once had knowledge that he must not. It may be that the Commissioner or the courts could properly define "inadvertence" in such a way as to preclude the issuance of a retroactive license in any case where the applicant violated a license he already held. However, the Commissioner has never laid down such a strict definition, and this court declines at this time to do so. Alternatively, the Commissioner might well, in his discretion, require a fuller showing of inadvertence from an applicant who has received and violated a prior license, but that is not the issue here. I hold, therefore, that Sun's violation of a previous license does not of itself preclude a finding of inadvertence, and that the existence and violation of a prior license is in other respects irrelevant to whether the Commissioner had the power to issue a new retroactive license.

█ As another ground in support of its motion, Barr submits that the Commissioner issued the retroactive license pursuant to a law that has been repealed, section 6 of the Boykin Act. Barr claims that whereas the present law, 35 U.S.C. § 184,[39] requires a showing of inadvertence to obtain a retroactive license, the prior law did not. Therefore, Barr contends, the Commissioner should have required a showing of inadvertence but did not. Barr points to Sun's petition, which specifically asked for a license pursuant to the prior law.[40] On the other hand, the petition did include affidavits to show inadvertence. However, apparently Barr is wrong; it is reasonably clear that the Commissioner issued the license under the new, not the old, law. Statements on the face of the license itself indicate that it was issued pursuant to 35 U.S.C. § 184.[41] Moreover, the decision issued by the Commissioner in response to Barr's petition for clarification confirms this view:

A petition concerning the above identified patent has been filed requesting that an inter partes proceeding be established to review and reconsider a retroactive license granted on this patent on October 26, 1965, and further requests a ruling as to the applicable statute relied upon in the granting of the aforementioned license.

Assuming without deciding that the Patent Office may revoke the grant of a license such as is here involved, it is clear that the patent statutes do not provide for an opposition proceeding to the grant of a license or as in this situation to consider whether such license should be revoked.

The granting or denial of retroactive licenses is a matter which is discretionary with the Commissioner. The authority for granting such licenses was established under section 6 of the Boykin act Public Law 690, 79th Congress, 2nd session and such authority has been extended by Statute 35 U.S.C. 184. Thus, the power to grant a retroactive license has been continuously with the Commissioner of Patents for a period which covers the interim from the date of initially filing in Canada to the date the retroactive license herein was granted.

---

38. "Inadvertence" is defined as:

    1: * * * lack of care or attentiveness: INATTENTION * * * 2: an effect of inattention: a result of carelessness: an oversight, mistake, or fault from negligence. * * *

Webster's Third New International Dictionary 1139–1140 (1961).

39. But see note 31 supra.

40. See Mem. Opp. Ex. A, pp. 1, 10–11. See also Reply Mem. Opp., p. 3.

41. See Mem. Opp., Ex. B.

There is nothing in the statute 35 U.S.C. 184 which limits the retroactive grant of a license to acts done within a fixed time period.

*The petition of October 26, 1965, was considered sufficient in this instance to grant the license prayed for under the existing statute.*

The licensing record of this application is deemed to be complete in itself and requires no further explanation of the reasoning leading to the granting of such license.

The petition is denied. (Emphasis added.)[42]

The emphasized language makes clear that a showing of inadvertence called for "under the existing statute" was required and was found sufficient. Accordingly, it is not necessary to consider Sun's involved argument that its right to a retroactive license without showing inadvertence under the old law (section 6 of the Boykin Act) has been preserved. Nor is it necessary to deal with Barr's equally complex rejoinder. Of course, the fact that Sun believed that it was entitled to a license under the old law and accordingly sought it on that basis would not prevent the Commissioner from issuing the license under the new law.

■ Finally, Barr argues that Sun's showing of inadvertence before the Commissioner was insufficient as a matter of law and that, therefore, even assuming the Commissioner used the section 184 inadvertence standard, he applied it improperly in issuing the retroactive license. I conclude that Sun made a sufficient enough showing as a matter of law.[43] Sun did not simply make "an averment of inadvertence, accident or mistake in the language of the statute, without any specification of supporting circumstances."[44] From the papers Sun submitted, the Commissioner could have made several factual findings supporting his ultimate finding of inadvertence. For example, a member of Sun's present law firm, the successor to the firm which filed the original patent application, after making a thorough investigation of the records extant swore that he found no suggestion of anything other than a non-willful mistake in filing prematurely in Canada.[45] The file and docket clerk of that firm, who had actually requested corresponding attorneys to file the Molitor application in Canada in 1950, swore that in her recollection the premature Canadian application was due either to her unawareness of the prohibition against such an application or to some other oversight on her part.[46] In addition, two other patent applications—not involved in this litigation—were filed prematurely in Canada at about the same time by correspondent counsel at the direction of the law firm. This suggests either that there was a grand design accounting for all three unauthorized applications, or, as Sun would have the Commissioner believe, that all three premature filings were accidental. The latter inference is buttressed not only by the sworn statements already referred to, but also by the further objective evidence that none of the three applications was filed before at least forty-four days had elapsed subsequent to the United States filing.[47] In other words, no more than sixteen days after each application was filed in Canada, its submission there would have been properly licensed. It seems more probable that all filings were inadvertent than that they were deliberate violations made after over six weeks had elapsed and only two weeks remained.

42. Re: Application of Robert P. Molitor, Serial No. 170,515, Patent No. 2,629,134, Comm'r of Patents, Feb. 2, 1966 (1st Ass't Comm'r E. L. Reynolds).

43. No ruling is intended on whether the Commissioner's decision, since supported by substantial evidence, is final and precludes Barr from raising at trial the issue of inadvertence.

44. See General Radio Co. v. Allen B. DuMont Labs., Inc., 129 F.2d 608, 611 (3d Cir.), cert. denied, 317 U.S. 654, 63 S.Ct. 50, 87 L.Ed. 526 (1942).

45. Mem. Opp., Ex. A, pp. 7–8.

46. Id., Ex. A, Affidavit of Velma Gillingham, sworn to Oct. 22, 1965, at para. 8.

47. Id., Ex. A, p. 8.

■ In reaching this determination, I have given weight to several considerations. First, it is ordinarily difficult to prove affirmatively inadvertence of this kind. In the nature of things such a conclusion would normally have to rest on proof of a diligent honest search for evidence of willfulness and the failure to find any such indication. Second, as the years go by—and it has been over fifteen years since the filings—evidence becomes harder to find. As Sun has stated, all the lawyers involved directly in making the Canadian applications have died.[48] Finally, the Commissioner is charged in the first instance with determining whether to issue a retroactive license. He has discretion within certain limits to set the legal standard for an adequate showing of inadvertence. In this connection, it must be remembered that the statutory provisions relied on by Barr were enacted primarily to safeguard national security. The sanction of patent invalidity was imposed by Congress to deter applicants from disclosing potentially classified information to other countries. The only apparent purpose in giving private litigants standing to contest the validity of a patent under section 185 is to add, through this unusual *jus tertii, a* private deterrent to the disclosure of government secrets abroad. Thus, in prosecuting its invalidity claim on this ground, Barr is acting as a private attorney general for the government; Barr has in no way been injured by Sun's failure to file properly in Canada, though it can stand to gain thereby. For this reason I conclude that, more so perhaps than in other areas of his jurisdiction, the Commissioner, as the agent of the true party at interest here—the government—should have considerable discretion in defining the legal standard of inadvertence under section 184.[49] Finally, the Commissioner is the initial trier of fact. I hold that his finding of inadvertence was based on sufficient evidence.[50]

■ I have considered Barr's other arguments, and they are not persuasive. Accordingly, Barr's motion for summary judgment is denied. In pre-trial conference with the court, and in one of its papers,[51] Barr requested the court to certify an appeal under 28 U.S.C. § 1292(b) from an adverse decision on the motion. I have carefully considered that section and am not of the opinion that all of the requirements for certification are met.

So ordered.

---

48. Id., Ex. A, pp. 6, 9.

49. See SEC v. Chenery Corp., 332 U.S. 194, 209, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

50. See Esso Standard Oil Co. v. Sun Oil Co., 97 U.S.App.D.C. 154, 229 F.2d 37, 39–40, cert. denied, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956). See also NLRB v. Hearst Publications, Inc., supra note 49.

51. Barr's Application for Advancement of Re-set Date on Motion for Summary Judgment of Invalidity and Vacation of Trial and Pre-trial Dates Pending Re-setting After Decision on Motion, p. 7.