The **BARR RUBBER PRODUCTS COMPANY**, Plaintiff,

v.

The **SUN RUBBER COMPANY**, and **Wonder Products, Inc.**, Defendants.

No. 60 Civ. 4327.

United States District Court
S. D. New York.

Oct. 20, 1967.

As Modified Nov. 21, 1967.

See also 253 F.Supp. 12.

Ely & Golrick, Cleveland, Ohio, Albert L. Ely, Jr., Cleveland, Ohio, of counsel, Darby & Darby, New York City, Harvey M. Brownrout, New York City, of counsel, Theodore A. Lazar, Columbus, Ohio, for plaintiff.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, Thomas F. Reddy, Jr., New York City, of counsel, Hamilton & Cook, Akron, Ohio, Everett R. Hamilton, Phillip L. Kenner, Akron, Ohio, of counsel, for defendant.

## OPINION

FRANKEL, District Judge.

In this action, begun on November 3, 1960, plaintiff, Barr Rubber Products Company, sues The Sun Rubber Company for:

(1) a declaration of invalidity and noninfringement with respect to United States Patent No. 2,629,134 relating to a method of casting plastic articles, and (2) damages and injunctive relief against alleged violations of the antitrust laws and allegedly unfair competitive practices.[1]

Defendant has counterclaimed for a judgment of validity and infringement of the patent.

## I. THE PATENT CLAIMS

In brief, non-technical language, the patent in suit covers a method for the casting of fully enclosed hollow plastic objects "from a liquid mixture of a vinyl resin and a plasticizer therefor" which solidifies and hardens through the application of heat during the procedure which the patentee, Robert P. Molitor (assignor to his onetime employer, Sun), claims to have invented. The steps of the process are: the deposit of the liquid material in one section of a two-piece mold (the amount being measured to produce the desired wall thickness of the finished hollow object); the closure of the mold; rotation of the mold, causing the liquid to spread in a wall around the inside; the simultaneous application of heat to bring the plastic through the stages of "gelation" (in which the matter is a gelatinous or coagulated "cheesy mass") and then "fusion" (the point at which the material becomes hard, its ultimate degree of elasticity depending upon the varying proportions of solid matter and liquid "plasticizer" employed); the cooling of the mold below the "fusion" temperature; and the opening of the mold and removal of the finished object.

In the more artistic language of the patent, Claim 1 (of the four claims) depicts the invention as follows:

"The process of making hollow articles from a liquid mixture of a vinyl resin and a plasticizer therefor, comprising the steps of depositing a measured charge of the said mixture in a hollow sectional mold, said charge being less in volume than the volume of the mold, said mold having non-porous

1. Wonder Products Company was also named as a defendant and charged as a conspirator with Sun in conduct said to constitute unlawful restraints and unfair competitive practices. By stipulation of the parties, Wonder Products has been permitted to stand aside awaiting the outcome of the contest between Barr and Sun. It will be sufficient, therefore, to refer to Sun as the single defendant.

inner surfaces, closing the mold with the charge therein to retain the charge within the cavity, rotating the mold in a multiplicity of planes to distribute the charge as a layer over the entire inner surface of the mold cavity, heating the layer to gel it against the inner surface of the mold while the mold is rotating, then applying additional heat to the closed mold to raise the temperature thereof sufficiently to fuse the gelled layer against the inner surface of the mold, cooling the mold until the temperature of the layer is below the fusing point of the material, opening the mold and removing the article therefrom." [2]

It will be noted that the material described in the patent claims is referred to as "a liquid mixture of a vinyl resin and a plasticizer therefor." According to defendant and much of the testimony, the quoted words should be read to mean, more briefly, a "plastisol," which is a small-particled polyvinyl chloride resin dispersed in a liquid plasticizer (or softening agent) containing no volatile solvents or diluents.[3] While neither the patent claims nor the specifications anywhere use the word "plastisol," and while the patent's words ("liquid mixture of a vinyl resin and a plasticizer therefor") literally include things which are not plastisols, defendant has argued persuasively that the references, in their context, should be deemed to focus on variously formulated plastisols. The subject is one, however, which will engage us again when we come to defendant's contention that an Italian patent claimed by plaintiff to anticipate Molitor's must be cast aside for the reason (among others) that it purports to cover an excessively broad range of materials, including many which would be unworkable.

The foregoing sketch, to be amplified as the discussion proceeds, is a sufficient background against which to consider the patent issues and explain the court's conclusions that (A) the patent is invalid and (B) assuming, for the sake of full adjudication at this level, that the patent were deemed valid, it would be held to have been infringed.

## A. *Invalidity of the Patent*

### 1. *Obviousness*

■ Molitor's alleged invention was an obvious combination of old and well-known elements, failing the test of 35 U.S.C. § 103.[4] Despite the length of the trial and the volume of the record, the facts bearing upon this point are largely undisputed.

The technique dubbed "rotational casting" in this case is at least 100 years old. There is specific and persuasive evidence that Molitor, if he was ahead at all, barely preceded several others in applying to the infant subject of plastisols a procedure that would have been obvious "to a person having ordinary skill in the art * * *." Postponing that for a bit, the history of rotational casting of other

2. The quoted claim is typical; the others add nothing of consequence for present purposes. Merely to note the variations: Claims 2 and 3 describe the "liquid mixture" as "deaerated." Claims 3 and 4 describe the gelled layer as being of "uniform thickness." Claim 2 speaks of "further heating" to fuse after gelling, and Claim 4 describes the same step as the "applying" of "further heat," while the third claim, like the first, speaks of "applying additional heat."

The essential similarity of the four claims for consideration of the disputed issues is acknowledged by defendant.

3. Close kin to a "plastisol"—or, according to some of the testimony, a more general category—is an "organosol," which differs in that its liquid phase does contain volatile elements which are freed in the course of gelation and fusion. The presence of such volatiles—and, specifically, the freeing of them when the material is solidified—renders an organosol normally unsuitable for casting in a closed mold.

4. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

materials goes far (probably sufficiently far) in itself to refute Molitor's claim that he invented something.

In 1855, one Peters was granted a British patent (No. 1308) for the rotational casting of "ordnance shells and other hollow vessels." Unlike (and superior to) Molitor, Peters showed equipment and a specific mode of rotation around two axes (as against Molitor's vague reference to "a multiplicity of planes") suitable for casting "metal or other substances which can be made sufficiently fluid by heat to be acted upon in the manner * * * described, and which will set or become rigid on cooling down." (P.Ex. 38, p. 4.)

Postponing plaintiff's many other references to early methods and means of rotational casting, one other may be mentioned at this point. In 1920, U. S. Patent No. 1,341,670 issued to Ransom Judd Powell for a machine and means "for shaping or forming plaster, metals and other plastic materials or substances." The invention was described as "particularly directed to the production of hollow objects * * * [consisting] broadly in achieving such result by the simultaneous turning of a matrix or mold on two different axes." The patented device was described as "adapted to be used in conjunction with molds for casting hollow objects which are substantially completely closed, and the selected embodiment of the invention * * * shown is directed to the casting or molding of relatively light-weight articles, such as statuary, artistic novelties, small figures, toys, etc." The invention described introduction of the liquid material into the mold, rotation (avoiding centrifugal force), and the hardening of the material against the mold wall during such rotation.

Purporting to dispose of such references, and speaking directly to the Powell patent, defendant's expert observed, correctly, that metals harden by *cooling* and plaster "by crystallization" (aside from Powell's reference to "other plastic materials or substances" and the absence of any reference in Powell to such obvious factors as cooling where appropriate) whereas Molitor dealt with materials which harden upon heating. (As is noted below, all are agreed that the flowing and hardening characteristics of plastisols were commonly known in the art before Molitor, and that he "invented" nothing in this respect.) But even if the Peters and Powell inventions stood alone—as they do not by any means—this asserted distinction seems trivial to the point of being regrettable.[5] Granting the customary (and frequently well-founded) humility lay judges are supposed to exhibit when confronted with the mysteries of natural science, machinery, and the like, it is difficult to accept that a patent should issue because somebody applies an ancient casting technique to well-known properties of some new material.

Furthermore, among the many items undisputedly in the prior art was the

---

5. Defendant puts heavy reliance upon its expert, urging that the force, learning, and "credibility" of his testimony should weigh heavily against plaintiff's efforts to defeat the patent in suit. Unfortunately 1or defendant, while its expert did not appear to depart from literal "truth" about concrete matters of fact, his ostensibly learned "opinions" were not impressive. He found himself in general incapable of learning anything useful from patents and other references invoked against Molitor. On the other hand, where Molitor's patent is obscure or silent, he was able to fill the gaps or dispel the clouds by easy reference to "common sense" or general knowledge. The example at this point in the text is by no means the most vivid, as subsequent discussion will show. It is notable, nevertheless, that a highly trained natural scientist should have found it a mark of "invention" to perceive that a technique usable for flowable materials which harden when heat is withdrawn could be transposed to liquids which harden when heat is added.

While plaintiff's expert was on the whole more helpful, he exhibited similar qualities of partisanship. Supporting the view that Delacoste anticipated Molitor, he professed a frequent inability to find meaning in the latter while the former struck him as pellucid in all vital respects.

known process of rotationally casting latex, which does require heating rather than cooling to harden it.[6]

However, before turning from the Peters and Powell patents, another of defendant's arguments may be noted. Defendant says Peters taught the use of centrifugal force for spreading the material on the inner mold wall whereas plastisols do not spread efficiently when subjected to such force. Instead, it is argued—and the record tends to support this—that to spread a plastisol in rotational casting, the substance should rest in a pool at the bottom of the mold and then adhere as the mold walls pass the pool in turning. There are decisive answers to the point (which is, incidentally, stressed by defendant with respect to other references plaintiff invokes, and is similarly refuted by what follows here). In the first place, Powell taught the avoidance of centrifugal force for plastic and similar materials. Secondly, the evidence establishes, as even laymen might know, that this argumentation about centrifugal force concerns a matter of degree rather than an absolute choice. All rotation produces some centrifugal force. The present point about rotational casting is that the rotation should be relatively slow, minimizing the operation of such force.

Further, and more strikingly, if defendant were correct on this subject, it would be acknowledging a most vital defect in Molitor's patent. There is not a word in Molitor about the speed of rotation or the necessity to avoid or minimize centrifugal force. He speaks merely, and vaguely, of "rotating the mold in a multiplicity of planes * * *." In significant contrast, the Italian Delacoste Patent, No. 440,295 of October 9, 1948 (which is claimed by plaintiff, and hereinafter found by this court, to anticipate Molitor) carefully specifies that the mold must oscillate "gently;" gives a specific speed of "uniform or cadenced" rotation in "the order of 10 revolutions per minute;" and prescribes the clear, and usually proper, procedure of rotation "around two axes preferably at right angles," a subject (among other pertinent ones) on which Molitor is also silent.

To move on now from Peters and Powell, the undisputed facts show an array of patents and other references over the years for the rotational casting of various materials capable of moving from liquid to solid form. Among the substances for which this casting technique was well known, in addition to various metals and plastics, were chocolate, wax, and, as mentioned above, latex.

If no more had been shown than the old age and wide application of rotational casting as a technique, plus the known and predictable qualities of plastisols, this might well have been enough to defeat Molitor's patent. Cf. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (1949); Ruben Condenser Co. v. Aerovox Corporation, 77 F.2d 266 (2d Cir.), cert. denied, 296 U.S. 623, 56 S.Ct. 145, 80 L.Ed. 443 (1935); Pierce v. Muehleisen, 226 F.2d 200 (9th Cir. 1955); Monaplastics, Inc., v. Caldor, Inc., 378 F.2d 20 (2d Cir. 1967). The defendant, confusing the question of novelty with the separate and additional test of obviousness, see Graham v. John Deere Co., 383 U.S. 1, 24, 86 S.Ct. 684, 15

---

6. The fact that latex had been rotationally cast before Molitor is, like so much else, undisputed. In the court's view, there is no need to tarry, therefore, over one reference plaintiff offered and defendant opposed for lack of proper notice. The simplest course in the circumstances is readily justified, and the court follows it. Plaintiff's Exhibit 381, the Kay Patent, is excluded.
The evidence showed that rotational casting is a more elaborate and delicate process for latex than it is for plastisols because (1) water must be removed from the latex in casting and (2) full curing must be accomplished as a later, separate step. The utility of this point to defendant is at best debatable. It would seem to show that the ancient casting technique was more readily and simply adaptable to plastisols than to an earlier plastic that solidifies with heat.

L.Ed.2d 545 (1966); United States v. Adams, 383 U.S. 39, 48, 86 S.Ct. 708, 15 L.Ed. 2d 572 (1966), argues insistently that Molitor must be deemed to have invented something because "it did not occur" to anyone before him to apply the ancient procedure to plastisols. Apart from the fact that the argument is misconceived, it is erroneous in fact. It occurred to several people, as reflected in both published and unpublished accounts, to adapt the old technique to the obviously workable new material. Before recounting those instances, however, some pertinent facts about plastisols should be recorded.

As has been mentioned, Molitor claims no invention with respect to the composition, formulation, or properties of plastisols.[7] This form of plastic material first came into use on any substantial scale in Europe, primarily Germany, during World War II. In the late years of that war, work and experimentation with plastisols was carried on in England, Italy, and, somewhat later, the United States. It was around 1946 and 1947 before plastisols achieved any substantial attention, even among companies which were to become important manufacturers of the component materials, in this country. Through the years until 1950, it remained in relatively short supply and was a high-cost material as compared with rubber, which was largely interchangeable for many uses. These factors of supply and price served to retard in some degree experimentation with new fabrication techniques and investment in new equipment for the manufacture of plastisol articles. And rotational casting equipment was relatively expensive in comparison with the apparatus needed for other casting techniques.

Notwithstanding such temporary inhibitions, the basic properties and utility of plastisols were well known, as defendant concedes, before Molitor's claimed invention. It was commonly known that heat in the range of 180–200°F. causes a plastisol to "gel"—to form the "cheesy mass" mentioned earlier. It was similarly familiar that at varying temperatures in the range (usually) of 300–350°, the plastisol would "fuse," the fusion temperature depending upon the particular formulation and being lower than the foregoing range for some variants. It was likewise known that a molded article had to be cooled below fusion temperature before removal from the mold to insure fixation and retention of its tensile strength.

Before the 1950's various molding techniques other than rotational casting had been adapted from their uses for other materials and were widely employed for manufacturing things from plastisols. Among these, one which has been much discussed in this case is "slush casting," a process as least as old as the work of the ancient Greeks in bronze. As transposed for use with plastisols, this process (in its most familiar variation) consists in (1) filling an open mold with plastisol, (2) heating to "gel" temperature so that a gelled layer forms around the inner surface of the mold, (3) pouring off the ungelled contents, (4) subjecting the mold to further heat sufficient to achieve fusion of the gelled layer, and, finally, (5) cooling so that the finished article may be removed from the mold.

A variation on the slush casting procedure made possible the manufacture of completely enclosed hollow objects. In this variation, each portion of a two-section mold would be brought to the gel

7. During the early stages of his sojourn through the Patent Office—from June 27, 1950, to February 24, 1953, during which period his original claims were all stricken and entirely rewritten—Molitor asserted he "was the first to apply the deaerating step to vinyl chlorides used in the molding of hollow articles." This assertion survives vestigially in Molitor's specifications, when he says (col. 3, lines 24–26): "The final mixing of the casting batch under vacuum is an important and essential step in the process." It is now conceded, however, under the compulsion of overwhelming evidence, that the "essential" step of deaeration was common knowledge well before Molitor among those working with plastisols.

stage following step "(3)" in the preceding paragraph; the two sections would then be clamped together to join the gelled walls before the whole mold was subjected to further heat for fusion, cooling, and removal of the finished article.

In still another version, perfected and known to others before Molitor, a mold with an aperture would be brought to an early, but still somewhat flowable, gel stage, most of the excess poured off, and the mold then inverted with its opening rested on a plate, allowing the gelled wall to flow and extend before fusion across the final enclosure formed by the plate. This procedure, like the clamping of the mold sections described above, was used to create completely enclosed hollow objects.

■ The three preceding paragraphs sketch very briefly some versions of a plastisol molding technique known and used in the art before 1948. Given that state of affairs and the wide familiarity with rotational casting as a generally usable process, it was at most a matter of brief time before people of ordinary skill came to combine these patently marriageable elements for making things from plastisols. Indeed, the alleged inventor, Molitor, in rare instances of insight and entire candor on the witness stand, twice described his achievement as "getting the jump" on the industry. This was no case of a need long felt and long unsatisfied despite vain quests—leaving aside that this would be a "secondary consideration" in any event. Graham v. John Deere Co., supra, 383 U.S. at 17–18, 86 S.Ct. 684; Greening Nursery Co. v. J and R Tool and Mfg. Co., 376 F.2d 738, 742 (8th Cir. 1967). It was at best a successful sprint to a complaisant Patent Office, resulting in monopolization of a development that was visible and certain to be recognized in short order by anyone interested and reasonably skilled in the art. See Ruben Condenser

Co. v. Aerovox Corp., supra, 77 F.2d at 268; Himmel Bros. Co. v. Serrick Corporation, 122 F.2d 740, 746 (7th Cir. 1941); Pierce v. American Communications Company, 169 F.Supp. 351, 355 (D.Mass.1958), aff'd, 280 F.2d 278 (1st Cir.), cert. denied, 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed.2d 195 (1960). To deny patentability in such a case is merely to recognize that Congress is not empowered, and has never reflected a disposition, to "authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available." Graham v. John Deere Co., supra, 383 U.S. at 6, 86 S.Ct. at 688, 15 L.Ed.2d 545.

This conclusion is not subject to the constant worry that lay judges will substitute uncritical hindsight for a legitimate judgment of what would have been "obvious" from the vantage point of the pertinent time and place. For, contrary to defendant's assertions, others than Molitor arrived at his "invention" before him or around the same time, and wholly independently of his efforts.

a. American Anode, Incorporated, engaged in formulating and selling plastisols (among other materials) rather than manufacturing goods from them, experimented over the years with various molding techniques and other modes of use to increase the sales of its products. Personnel of this Company developed, publicized, made no secret of (and made no attempt to patent) the process of Molitor's patent over a year before the filing of Molitor's application on June 27, 1950. The oral deposition testimony supporting this finding is somewhat vague and unsatisfying when considered by itself. But the testimony does not stand alone. It is powerfully corroborated by unquestioned documentary evidence, an American Anode bulletin of July 1949 clearly and succinctly describing the technique Molitor purports to have invented.[8]

8. It makes no difference for the question of obviousness treated here that the bulletin failed by a narrow margin to precede Molitor's application by more than a year, and thus presented no bar under 35 U.S.C. § 102(b). It should be observed in this connection, however, that plaintiff has urged the assignment to

Though less wordy than Molitor, this bulletin tersely taught everything Molitor claimed. Describing one among several molding procedures (including the technique of slush molding sketched above), it outlined the steps for rotational casting as follows (P. Ex. 33, p. 3):

"1. Pour a premeasured amount of Ameran Resin Paste [plastisol] into the mold.

"2. Rotate the mold to distribute the paste uniformly over all contact areas of the mold cavity. Provisions should be made for a heating chamber or oven in which the mold may be rotated, preferably at temperatures of 350°F. Exposure for 20–40 minutes during rotation will completely fuse the plastisol.

"3. Allow mold to cool (if desired, the mold may be cooled rapidly in cold water). Remove product from mold."

Defendant makes no serious attempt to question that this covered fully what Molitor undertook to patent.[9] The document leaves no doubt that it reflects work preceding its publication date, as the oral testimony affirmed. Its brief, casual, informal disclosure for all the world is strong evidence that the process should be held to have been obvious for those skilled in the art.

b. Properly invoked by plaintiff on a variety of grounds, the Italian Delacoste patent, No. 440,295, applied for on December 11, 1947, and granted October 9, 1948, adds further support to the argument of obviousness. Since this patent is more fully considered below in holding that it anticipates Molitor, it is sufficient merely to note its pertinence here as well. Cf. Felburn v. New York Central Railroad Company, 350 F.2d 416, 424–425 (6th Cir. 1965), cert. denied, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966); Helene Curtis Industries v. Sales Affiliates, 233 F.2d 148, 154–155 (2d Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956); Himmel Bros. Co. v. Serrick Corporation, supra, 122 F.2d at 745.

c. The evidence shows, and the court finds, that several other companies and people perceived the availability of rotational casting as a procedure for manufacturing plastisols before Molitor did or at about the same time, all independently of his efforts, which were kept secret until at least 1950. It was known to a Canadian company, Reliable Toy, at least as early as 1948. It was likewise known to a New York company, Ideal Toy, at about the same time. It was being employed experimentally in plaintiff's laboratory in 1949 although the necessary equipment to make it effective there for commercial production was not installed until several years after that.

While these efforts may have matured later than Molitor's, this fact is scarcely decisive on the question of obviousness. What the court finds compelling is the inference that Molitor's was in no sense a unique perception—that others all around him were arriving at, or verging upon, the simple combination of familiar things he undertook to patent.

It is pertinent, too, that the experimental character of work other than Molitor's is at most an equivocal item in his favor. The evidence demonstrates that what he taught (and failed to teach) would have left a need for considerable experimentation by anyone seeking to use his teachings. He purported to emphasize, for example, the benefit of uniform wall thickness. But the evidence shows that he was himself unable to achieve this desideratum with any but

---

Molitor of some filing date later than June 27, 1950, the contention being that the initial application was not "effective" because of certain omissions and later amendments. There is no need, all things considered, to dwell upon this argument by plaintiff beyond recording that the court has rejected it.

9. Defendant's expert made some quibbling efforts (Tr. 4131 et seq.) to show teachings in Molitor assertedly absent from (or inferior in) the American Anode bulletin. The net of his suggestions is to reenforce plaintiff's thesis that the bulletin amply covered the same thing in every pertinent respect.

the simplest of molds.[10] He spoke vaguely of rotating in a "multiplicity of planes," but his own testimony shows that experiments would be necessary with particular molds to achieve the kinds of rotation that might approach desirable distribution. And so, for example, when a consultant for Reliable Toy in Canada said in 1948 that rotational casting was "difficult" though feasible, he announced little, if anything, less than Molitor later purported to teach.[11]

d. An interesting chapter in the evidence on obviousness is the deposition testimony of Frank Stefanski, described by defendant as one who "consistently and repeatedly told a straightforward story of his experimental and developmental work in the rotational casting of vinyl plastisol." Plaintiff contends in this frequently bitter lawsuit that defendant "got to" Stefanski and caused him to lie. However that may be, the court finds it sufficient to accept what Stefanski said, because it represents, as it stands, additional support for plaintiff's assertion of obviousness.

At least as early as 1947 or 1948, using primitive equipment in the basement of his home, Stefanski proceeded to do what Molitor later patented, but with one assertedly fatal imperfection: the sections of his molds did not fit together perfectly so that, as defendant describes his plight, "he got leakage from the mold before the material gelled." (Trial Brief of Defendant, p. 199.) Confronting that disaster, this "straightforward" witness said, he despaired and gave up rotational casting. Thirty or so pages after the last-cited reference, meeting an attack by plaintiff upon the adequacy of Molitor's teachings, defendant writes (id., p. 231): "It doesn't take much percep-

tion to observe that the liquid material would leak out if it were not a completely closed mold."

It is enough to say of Stefanski that his rudimentary efforts as early as 1947 help to buttress plaintiff's demonstration that Molitor's patent is invalid because "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *." 35 U.S.C. § 103.

Defendant's extensive efforts to show novelty and nonobviousness in Molitor's patent serve in the end to help vindicate plaintiff's contrary view. Characteristically, both in its brief and in its expert testimony, defendant tends to recite the whole of Molitor's claims to support its position on this subject. Responding, however, to the pressure to focus somewhere, defendant comes finally to the assertion that Molitor was new, original, and nonobvious because he hit upon and taught "a continuous casting process utilizing only a single temperature"— the high fusing temperature to carry the material all the way from liquid through gelation to fusion.[12] Before Molitor, the argument runs, people had gelled the plastisol at a lower temperature, around 200°F., then fused it, in a second step, at the higher temperature. Defendant's expert said he would have been surprised to the point of incredulity to hear that the job could be done in Molitor's continuous way in a single heating step at the high temperature. And so this emerges in the end as an assertedly critical point, iterated over and over again in defendant's post-trial briefs.

But the argument is a clearly baseless afterthought for a variety of reasons.

---

10. A "Mickey Mouse" was a central character in the trial and is pictured on Molitor's patent with the much extolled and discussed "uniform wall." Samples of this figure made in defendant's plant by Molitor's process were also in evidence. They had distinctly non-uniform walls. Molitor's quaint explanation was that a uniform wall was not really wanted for the actual toy.

11. Pressed repeatedly to specify what Molitor taught that was new, defendant's expert came finally to say that Molitor's achievement lay in his proclaiming that rotational casting of plastisols was "possible."

12. Trial Brief of Defendant, p. 15.

To begin with, the text of the patent itself is inconsistent with this newly contrived theory. In each of the four claims, gelling and fusion are described as separate heating steps. Claim 1 teaches that the mold should be rotated,

"heating the layer to gel it against the inner surface of the mold while the mold is rotating, *then applying additional heat to the closed mold* to raise the temperature thereof sufficiently to fuse the gelled layer * * *." (Emphasis added.)

Similarly, Claim 2 describes gelling, and then prescribes "further heating * * * to fuse the gelled layer * * *." The two remaining claims are to the same effect. The file wrapper history shows that these references to "further" and "additional" heating were specifically and deliberately added to the final revisions toward the end of the application's tortuous journey through the Patent Office.

If the singular product of Molitor's genius was the single heat at fusion temperature for the whole process, this was a remarkably unsuitable way to teach it.

Further demonstrating the recency of defendant's insight on this subject is its inconsistency with what defendant taught the Sixth Circuit almost ten years ago in the submissions leading to the favorable decision for the patent in that Court. National Latex Products Co. v. Sun Rubber Company, 274 F.2d 224 (1959), cert. denied, 362 U.S. 989, 80 S. Ct. 1078, 4 L.Ed.2d 1022 (1960), a decision of major interest discussed at length hereafter. In its successful brief on that appeal, defendant enumerated the several steps of Molitor, and included (p. 5):

"4. heating the layer to gel it against the inner surface of the mold while the mold is rotating,

"5. then applying additional heat to the closed mold to raise the temper-ature thereof sufficiently to fuse the gelled layer against the inner surface of the mold * * *."

The opinion of the Sixth Circuit Court of Appeals reflects that description.

Of course, the obvious advantage of rotational casting—as against slush casting, for example—is that the process can be continuous from the time the mold is closed until the finished object is removed. But this, for reasons already reviewed, was not a novel or nonobvious discovery. The focus here is on the particular point defendant has chosen now to stress—the single high temperature throughout. What has been said thus far is that this has only become in this lawsuit a supposed matter of particular consequence. It was never isolated or emphasized—but actually contradicted—in the terms of the patent and its previous defense. Cf. Graham v. John Deere Co., supra, 383 U.S. at 25, 86 S.Ct. 684, 15 L.Ed.2d 545.

Furthermore, the point is trivial. It is not to be supposed that defendant would concede noninfringement if the rotating mold passed through two heating chambers—one at gelling temperature, a second at the higher fusion temperature — during the continuous molding process.[13] Indeed, the testimony made clear the common practice in this art, as in others, of using hanger conveyors for moving molds along through the stages of the casting process.

Finally, if Molitor had claimed some invention in this respect, the claim would lack substance. The evidence shows that it was known in the art that a mold could be exposed to the high fusion temperature to achieve the earlier (gelation) stage as well as the later condition of fusion. It is sufficient here to refer to the American Anode bulletin of July 1949, quoted earlier, which described the procedure of rotational casting and plainly contemplated (unlike Molitor) handling of the whole business in a

13. Compare the converse argument of plaintiff, considered and dismissed later on, that there is no infringement because plaintiff uses a single heating step while Molitor must be read to teach two.

single heating chamber at a single high temperature—namely, "preferably at temperatures of 350°F."

The subject of temperature is the closest defendant comes to suggesting anything nonobvious about Molitor. The suggestion must be rejected.

■ To conclude on the issue of obviousness, it may merit reemphasis that this barrier in § 103 commonly blocks patentability in cases where nobody has arrived independently at the result claimed by the alleged invention—and even in the face of evidence, absent here, of a need long recognized but unsatisfied. The evidence that has been canvassed of work by others serves more clearly to demonstrate the obviousness plaintiff asserts.

2. *Anticipation by Delacoste*
 *Italian Patent No. 440,295*

■ We focus more closely here upon an item noted under the preceding heading. The court holds that in light of the Italian Delacoste patent of October 9, 1948, Molitor's patent is invalid on the separate and independent ground that "the invention was patented or described in a printed publication in * * * a foreign country * * * more than one year prior to the date of the application for patent in the United States * * *." 35 U.S.C. § 102(b).

The Delacoste patent, which was not cited in the Patent Office, reads in directly pertinent part as follows:

"This invention relates to a process of manufacturing hollow molded objects of natural or synthetic resin, weldless, seamless and practically without a gap * * *, as well as to a large variety of hollow molded objects which can be obtained by this process.

"According to this invention, the process consists primarily in depositing in a mold, completely closed but demountable to permit extraction of the manufactured object, an amount of natural or synthetic resin necessary to obtain by deposit on the inside surface of the mold the desired wall thickness. Said resin is mixed with a plasticizer * * *. Thereafter it is heated, letting the mold oscillate gently so that the resin deposits itself uniformly on the entire surface, and the operation is prolonged until the gel has solidified (becomes firm) * * *, whereupon the mold is opened and the manufactured object is removed.

"Thus, for example, to produce a seamless hollow object of polyvinyl resin, said resin may be kept in suspension in a suitable plasticizer * * *.

"The amount of resin with its desired plasticizer is placed into the mold, the latter being closed and heated and the operations continue as indicated above. The heating of the mold can be brought about by projection of Steam, by immersion in a hot (warm[14] liquid, electrically, electromagnetically, or by any other means.

* * * * * *

"Whatever may be the resin used for obtaining the deposit on the surface of the mold of a uniform product layer, it is necessary to have the mold utilized oscillate in a methodical, slow and regular manner. Thus, in accordance with one of the characteristics of the invention, excellent results are

14. The parenthetical word, here as elsewhere in the *quoted* portions of the Italian patent, represents an alternative translation of the original Italian—in this instance, the word "*caldo.*" It is conceivable that daring lawyers or judges, recalling encounters with Italian sinks or Italian colleagues or Italian-English dictionaries, might deem it knowable without more that the word "*caldo*" may mean either "hot" or "warm" depending upon the context. The defendant, however, announced early in the trial a disposition to mount intensive attacks upon this word in the Italian patent. Plaintiff produced a distinguished expert in the Italian language to cope with this problem. The upshot of this effort is a finding that the Italian word "caldo" may mean either "hot" or "warm" depending upon the context.

obtained by using a mold capable of revolving in a uniform or cadenced way, at a speed which can be of the order of 10 revolutions per minute, around two axes preferably at right angles (orthogonal).

"The mold, for example, may be carried by an oscillating arm pivoted around its axis, which arm is caused to rotate around an axis perpendicular or not to the preceding one.

"One observes that the process for obtaining hollow objects or bodies without joints, by a deposit on the inside surface of a closed mold has already been suggested for other uses, and that the invention is limited to the particular and new application of this process for the purpose of obtaining objects of natural or synthetic resin capable of forming a gel or thermo-hardening. This invention concerns itself also with new industrial products, hollow objects, of a regular thickness and without seams, made of natural or synthetic resin, which could not be produced heretofore.

"CLAIMS

"1. The process of manufacturing hollow objects substantially closed and without seams, by a deposit of a fluid or meltable and hardening substance on the inside surface of a closed, rotatory mold, consisting in depositing in the mold the desired amount of natural or synthetic resin, to obtain on the mold a layer of convenient thickness, to which is added if required a hardening agent, by causing the mold to rotate gently in every (any) direction in order to obtain a uniform layer of resin on the entire inside surface of the mold, by heating to transform the layer of resin into gel, thereafter opening the mold and withdrawing the hollow object thus produced."

To state the court's conclusion broadly, everything Molitor purported to teach is found in the foregoing patent; the arguments of defendant for a contrary view are without merit.

a. Defendant's most insistent point— stressed in the briefs, elaborated in the testimony of defendant's expert, and deemed critical in the decision of the Court of Appeals for the Sixth Circuit, National Latex Products Co. v. Sun Rubber Company, supra—is that Delacoste failed to reach the target because he wrote only of causing the material to "gel," omitted the further need to fuse and cool, and so taught a futility. Delacoste not only failed to mention "fusing" and "cooling," say defendant and its expert, but he mentioned "projection of steam" among the several heating means he suggested; this *must* be read to show a temperature not greater than 212°F.; and so, the argument concludes, Delacoste obviously fell short of fusing and cooling the object. Whatever might have been thought of these contentions on the Sixth Circuit's smaller and different record, they are exposed as frivolous on the record before this court.

If Delacoste is read with a view to learning from him—which is the assumed stance of one with ordinary skill viewing the prior art, cf. Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345, 350 (2d Cir.), cert denied, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945); Application of Hooker, 175 F.2d 558, 562, 36 C.C.P.A. 1164 (1949); Pickering v. McCullough, 104 U.S. 310, 319, 26 L.Ed. 749 (1881)—it is perfectly clear that he did not mean to have the process stopped at the "gel" stage as the quoted word is currently used [15]—i. e., that he did not mean for the user to open the mold and be rewarded with only the drooling of a useless "cheesy mass" to be discarded as waste. He announced that the goal of his process was a "man-

15. The record shows that when Delacoste obtained his patent, it was common, especially in Europe (including England), to use the word "gel" ambiguously, tending to bracket under it the stages now separately identified as gelation and fusion. Defendant's expert tardily conceded this. But defendant's views on the subject lack substance even apart from this pertinent item of linguistics.

ufactured object;" that the operation should be prolonged "until the gel has solidifie[d] * * *, whereupon the mold is opened and the manufactured object is removed." He stated repeatedly that the last step was the opening of the mold "and withdrawing the hollow object thus produced." Defendant concedes the common understanding that plastisols had to be fused and cooled (at known temperatures) before they could be withdrawn from their molds (in any casting process) as "manufactured objects." Only a persevering desire to fail, or ignorance of what everyone knew, could have led to reading Delacoste as defendant insists he must be read.

The expert upon whose persuasiveness defendant puts heavy weight came slowly and grudgingly to this conclusion. He acknowledged, finally, that reading Delacoste in 1948, and knowing what was familiar to those skilled in the art about fusion and cooling, he would have carried Delacoste's teachings through these stages. He conceded, too, that Delacoste mentioned heating means clearly adequate for achieving the necessary temperatures.

After his concessions had been made, defendant's expert clung to an insistence that Delacoste was inferior to Molitor because only the latter taught that the whole procedure could be conducted at the single (fusion) temperature of over 300°F. The character of this point as a recently contrived, trivial, misleading irrelevancy has been treated earlier at more than sufficient length.

b. It is also asserted that Delacoste could not be read to disclose what Molitor later taught because the Italian patent covers a broad range of materials, both workable and unworkable, and fails to focus with clear and exclusive precision upon "plastisols." Molitor, it is argued, displays the virtue of such a clear reference.

It is true that Delacoste covers many things more than plastisols. But his references clearly cover plastisols, as anyone in the art concerned with them would have seen promptly. On the other hand,

it is not true that Molitor achieves the asserted clarity on this subject. To begin with, "plastisol" was a familiar and sufficient word to describe a "plastisol" when Molitor made his alleged invention. But Molitor's patent never uses the word. Secondly, the phrase he does use—"a liquid mixture of a vinyl resin and a plasticizer therefor"—is neither exclusive of other things nor an apt way of saying "plastisol." Among his possibly inadvertent concessions on cross, defendant's expert was brought to admit that Molitor's language was not well suited to describing a "plastisol." He acknowledged that the words could also refer to an "organosol," obviously unsatisfactory for rotational casting. The evidence shows, in short, that anyone bent on learning nothing from Molitor (as the defense was with respect to Delacoste) could find that he described in his general words an array of other materials unsuited to the process.

To rescue Molitor from this fate, the defense expert observed, fairly enough, that he would have brought to the patent his "common sense," his appreciation of the context, his learning about plastisols, and his interest as one skilled in the art to discover practical benefits from what was being taught. But this entirely reasonable approach gives up the ghost of the theory that nothing good could have been found in Delacoste. The record makes clear that defendant's expert, like other interested persons with ordinary skill in the art, would have perceived the utility and workability in Delacoste (and Delacoste's entirely ample reference to plastisols) no less than in Molitor.

Indeed, while it is not strictly essential, it bears some emphasis that Delacoste's teachings were plainly superior to Molitor's in relevant respects. Delacoste defined precisely the mode and speed of rotation. While defendant's expert recognized the absence of any such teaching in Molitor, he said he would have been able to supply it by again invoking his "common sense." And defense counsel— supporting an invention he repeatedly

epitomizes as "rotational casting"—came finally to the sound view that there was no need for Molitor to tell how to rotate because "the art will tell you that" (Tr. 4261).

Defendant formulates in various ways its attacks upon the adequacy of Delacoste's teachings. But they come in the end to the thoughts that have been discussed above. Underlying these thoughts are some legal premises on which a few words should be said. It is urged, for one thing, that foreign patents like Delacoste's should be "strictly construed." There is support in the books for this. See, e. g., National Latex Products Co. v. Sun Rubber Company, supra, 274 F.2d at 236; Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., 218 F.Supp. 325, 330 (N.D.Ill.1963); Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 659 (N.D.Ill.1961). There is a good deal of weighty sentiment to the contrary. See, e. g., Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989–990 (2d Cir. 1942); Trussell Mfg. Co. v. Wilson-Jones Co., 50 F.2d 1027, 1029 (2d Cir. 1931); Application of Moreton, 288 F.2d 708, 711, 48 C.C.P.A. 875 (1961). If it were necessary for this lower court to come down hard on the subject, the latter view would be followed. Where the essential inquiry is whether the subject was adequately and publicly taught over a year before the United States application—and noting that the statutory bar in 35 U.S.C. § 102(b) applies no less to foreign "publications" than to patents —there is no good reason in our time of international business to extend patent monopolies here by artificial excisions from foreign contributions. Cf. Greiser v. Brenner, 253 F.Supp. 906, 909 (D.D.C. 1966).

In any event, even "strict construction" does not entail the obstinate failure of comprehension urged by defendant and its expert. Reading Delacoste only with the understanding of those modestly skilled in the art, it anticipates Molitor.

Defendant has seemed sometimes to suggest (although defense counsel has explicitly and correctly disclaimed the suggestion) that Delacoste fails to anticipate because its vagueness and excessive breadth would not have met United States standards of patentability. In the circumstances, it is sufficient to note that this is not the test under § 102(b). Cf. American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977 (8th Cir.), cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

3. *The Sixth Circuit decision and defendant's fabrications as to date of conception.*

Already mentioned more than once, defendant's victory of almost a decade ago in the Sixth Circuit, National Latex Products Co. v. Sun Rubber Company, supra, has been a central subject in this lawsuit. That decision by a divided court (McAllister, J., dissenting) affirmed in all presently material respects the views of Chief Judge Jones in the District Court for the Northern District of Ohio, 159 F.Supp. 661 (1958). In this court, defendant has urged at length the heavy weight of those judgments and the burdensome anomaly of having a later decision invalidate a patent upheld so long ago.

Somewhat more unusual is plaintiff's effort to employ that unfavorable precedent as an independent and affirmative ground for denying enforceability of the patent. Plaintiff's thesis is that defendant perjuriously misled the Sixth Circuit in material respects, that the same false evidence has infected this court's record, and that defendant is precluded as a result from seeking enforcement of the patent here. For reasons now to be stated, plaintiff prevails on this aspect of the case.

a. *Grounds for departure from the Sixth Circuit's decision*

■■ The principles governing this aspect of our problem are familiar. The decision on patent validity of another federal court, especially a higher one, is entitled to great weight, as defendant says. See Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 133 (2d Cir.), cert. denied, 358 U.S. 884,

79 S.Ct. 124, 3 L.Ed.2d 112 (1958); Cold Metal Process Company v. Republic Steel Corp., 233 F.2d 828, 837 (6th Cir.), cert. denied, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956); Novadel-Agene Corporation v. Penn, 119 F.2d 764, 766 (5th Cir.), cert. denied, 314 U.S. 645, 62 S.Ct. 85, 86 L.Ed. 517 (1941). But it is not binding. See, e. g., Jungersen v. Baden, 69 F.Supp. 922 (S.D.N.Y.1947), aff'd, 166 F.2d 807 (2d Cir. 1948), aff'd sub nom. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (1949); Stanley Works v. Rockwell Mfg. Co., 203 F.2d 846, 848 (3d Cir.), cert. denied, 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 345 (1953). Where, as in this case, the record leads compellingly to a different conclusion, the second court is forced, with all respect, to render a conflicting judgment. It is of importance, however, to state the grounds on which it appears to this court that the Sixth Circuit was led into error.

(1) For reasons already stated, this court has found that the Italian Delacoste patent anticipated Molitor's. Apart from the doctrine of strict construction applied by the Sixth Circuit to Delacoste (see 274 F.2d at 236),[16] that Court seems to have erred in material respects on this question. It singled out as a critical omission from Delacoste and an "essential and non-obvious step" in Molitor "the temperature change necessary to accomplish the transition of the material from gel to fusion." Id. at 235. Repeatedly emphasizing this "all-essential feature" (ibid.), the Court said "Delacoste teaches gelling and not fusion." Id. at 236. In the present case, however, to go no farther than the concessions of defendant's present expert, it is perfectly clear that anyone skilled in the art would have read and used Delacoste to bring the "manufactured object" to the point of fusion, followed by cooling.

(2) The Sixth Circuit appears to have been led to an excessively expansive view of what Molitor accomplished. It observed (though he seems not to claim) that he created "a new product" (id. at 239). It seemed to credit him with evolving the slush molding of plastisols (see id. at 240), though he acknowledges here that this was no part of his achievement.

(3) The Sixth Circuit was impressed by the "enormous commercial success" of Molitor's invention. Id. at 238. On the evidence here, it is difficult to perceive the basis for that characterization. Defendant has shown, to be sure, that its own plant produced some millions of "pieces" by the Molitor process in the 1950's. How "successful" or profitable this was is another question, largely unanswered, though it is perhaps relevant that defendant in 1958 (five years after Molitor's patent) was undergoing a Chapter XI reorganization when the Sixth Circuit opinion was written and for some time thereafter. As to more objective measures of patent success, defendant's case is notably unimpressive. Up to the time of the Sixth Circuit decision, defendant had acquired exactly one domestic licensee, and that a most equivocal one. The single licensee, B. F. Goodrich, was in the business of supplying materials for plastisols. At the time Goodrich took a license, at a modest price, defendant contracted to purchase for a year 75% of its resins from Goodrich, agreed to promote Goodrich resins with other licensees, and thus made commercially attractive this means of ostensible tribute despite the view of Goodrich's counsel that the Molitor patent was not a valid one.

(4) Perhaps the most significant point of all diminishing for this court the weight of the Sixth Circuit's decision is the overwhelming demonstration by the plaintiff here that the Sixth Circuit's record, like the one now under considera-

16. A doctrine which appears, incidentally, to have had less standing in the same Circuit both before and since the decision in Sun's favor. See Allied Wheel Products v. Rude, 206 F.2d 752, 759–760 (6th Cir. 1953); Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F. 2d 406, 413 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

tion, was blighted by perjury in significant respects.

In the Ohio Court, as here, Sun placed Molitor's date of invention at April 10, 1948. Central to that obviously material proposition was an oddly scattered series of a few so-called "progress reports" by Molitor ranging from early April 1948 to February 1, 1949, with huge and suspicious gaps in the series.[17] For a long time, until the midst of the trial here, defendant was able to produce only copies of the papers that were before the Sixth Circuit. Employing both the copies and the ones belatedly produced—and pursuing a course of tenacious cross-examination—plaintiff was able to prove overwhelmingly the falsity of defense testimony about them and the falsity of the inference urged from them (and accepted by the Sixth Circuit) that Molitor made his invention in early April of 1948.[18]

To state the gist of what plaintiff has shown, it is that the reports prior to February 1949 were all concerned in fact with Molitor's work on such old techniques as slush casting, not rotational; that the testimony of defense witnesses attempting to show these papers as records of rotational casting is so clearly false and self-contradictory as to reveal deliberate untruthfulness; and that the efforts in this court to embellish and sustain what was told in Ohio serve only to highlight the falsity of the account in both places. These conclusions rest both upon the inherent incredibility of the testimony (analyzed in relation to the documents) and upon the demeanor of the witnesses. Without attempting to detail exhaustively the factors underlying these ultimate determinations, some important items should be recorded:

(1) The exposure of defendant's fraud as to the time of conception begins with a document which was not before the Sixth Circuit but was turned up toward the end of the present plaintiff's dogged discovery on another (and less fruitful) subject. The document relates to the prosecution of Sun's Canadian application for a patent on Molitor's process in the course of which the Italian Delacoste patent, considered earlier herein, was cited, as it had not been in the United States Patent Office. In the correspondence on this subject, Sun's Akron patent counsel became concerned (unnecessarily as it developed) with the possible materiality of the Italian patent's grant date (October 9, 1948) as against its printing date (July 1949). Inquiring on this subject, Akron counsel wrote to the Canadian attorneys the following letter of November 30, 1956 (P. Ex. 256X, emphasis added):

"I am in receipt of an Office Action, dated November 23, 1956, in the above entitled case in which the Patent Office cites Italian Patent No. 440,295, which was granted October 9, 1948, but was not printed until July 1949. We have met this patent in connection with certain litigation on the corresponding U.S. patent in this country and are prepared:

"1. To point out the essential difference between the Delacoste patent and the disclosure in the Molitor application, and

"2. To contest the effective date of the patent.

---

17. Testimony for the defense was that Molitor was to make such reports weekly at first, later monthly. But the gaps are much larger than weeks or months. A defense witness suggested the explanation that Molitor was engrossed in his work, impatient over writing things down. Yet one of the longest of the few documents ascribed to him was shown to have been copied to a large extent from publicly available writings distributed by Goodrich.

18. For reflections of the importance ascribed to this point and the "progress reports" by the Sixth Circuit, see 274 F.2d at 231, 233, 234. It is unnecessary for our purposes to pinpoint exactly the extent to which the subject was deemed critical by that Court. It is sufficient that it was obviously considered to be material and was offered by Sun, both there and here, to be so considered. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 247, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

"In connection with the latter matter, will you please advise me whether under the Canadian Patent Law the date of the grant is taken as the effective date of this patent or the date of the printing. *We can carry the date of the Molitor invention back of the printing date, but cannot carry the date of the invention back of the granting date of the Italian patent.* In this connection, of course, I will have to be advised whether an earlier invention in the United States can be used in Canada to anticipate a situation of this character."

Thus, over ten years ago, with memories fresher and all the documents more readily available, defendant acknowledged (through counsel who had obtained the United States Patent) that it could not claim a date of invention before October 1948.

Later, in the Ohio lawsuit, it became apparent that a still earlier date of invention might be necessary to defeat claims of prior invention made there. That was the inception of the false testimony about "progress reports" extending back to April 1948 found persuasive in the Sixth Circuit and perpetrated again in this court.

Plaintiff lays great stress, as well it might, upon the fatal admission in the letter of November 30, 1956, recording that the date of invention could not be placed earlier than (or, evidently, as early as) October 1948. On the other hand, defendant's lengthy briefs are devoid of any reference whatever to this key exhibit. There is no attempt to explain the startling contrast between

(1) the acknowledgment closer to the events, by counsel who prosecuted the American patent application, that all the relatively recent information available to him dated the alleged invention after October 1948, and (2) the testimony here—by defendant's president, the inventor, and defendant's chief chemist, all assertedly documented by reading meanings into progress reports —that the significant and memorable

achievement had been accomplished in April 1948.

The wholly unexplained contradiction goes far in itself to expose the falsity of the testimony on this subject. But the record further demonstrates this conclusion in other ways.

(2) Although it is testified that the progress reports, starting in April 1948, announce what was characterized by defendant's president as a major and unforgettable breakthrough to the rotational procedure, there is not a word about "rotation" or "rotating" (or turning or revolving or anything of the kind) in any one of them before February 1, 1949, where the simple and obvious words were used to describe the *then* new procedure.

(3) The Sixth Circuit found impressive, and particularly noted, Molitor's report of April 20, 1948. The Court also referred to handwritten notes in the margin of this report. See 274 F.2d at 233. Our record—and, really, the report on its face—shows that the report was not about rotational casting at all. The addressee of the report, Mr. Cartlidge, testified on deposition in the present case that it referred to slush casting. At the trial, after consulting with counsel, he changed this testimony. His first account was the truthful one. The marginal notes were made long after the report. The passage deemed significant by the Sixth Circuit refers to "curing * * * *under* infra red lamps * * * held 4 inches *above the mold*" to produce a temperature of 450°F. (emphasis added). It would be difficult even for a layman to produce a more misleading description of "rotational casting" on a machine with heat sources all around the revolving and rotating arm holding the mold—the picture the testimony would have the court discern in the report. If there were doubt that this is a false picture, it would be ended by the shifting, evasive, and thoroughly incredible efforts of Molitor to sustain defendant's contention on the witness stand.

(4) Molitor testified repeatedly, but not truthfully, that he was creating hollow toy lambs by rotational casting in

April 1948. The evidence shows that he was using a *vented* lamb mold at that time, unsuited to the claimed process. When he came finally to cast a lamb rotationally, his report of February 1, 1949, said so—for the first time. The report for April 20, 1948, alleged to reflect (though it nowhere mentioned) successful rotational casting of lambs, was amplified by Molitor's testimony that these April efforts produced a number of satisfactory toys by the new process. If the testimony were true, there would be no sense in Molitor's announcement almost a year later, in the February 1, 1949, report, which said: "Using a Rotating Machine developed in our Machine Shop and a lamb mold made of cast aluminum several lambs were cast from the Vinyl Plastisol Paste." [19]

(5) Molitor testified to pouring the plastisol into a cool mold before beginning rotation in April 1948. The contemporaneous document shows loading of the mold at 200°F.

(6) Defendant's president, Smith, undertook to shore up the April 1948 story by recalling a middle-of-the-night telephone call from Molitor (then an $86-per-week employee paid by the hour, and only placed in the higher, salaried category months later) urging excitedly that Smith come from his home to the plant to see a successful sample of a rotationally cast lamb.[20] The call and his response were etched indelibly on his memory, Smith said: "I'll never forget it." So he went, he testified, and saw the lamb. But this vivid recollection was not given to the Ohio court when Smith testified some ten years closer to the alleged event. The story is not true. There were no rotationally cast lambs at the plant in April 1948 at any time of the day or night.[21]

(7) On May 1, 1948, defendant's plant was struck. Molitor—allegedly having made the invention which, according to Smith, opened a whole "new panorama" for the company—went to his home in another state while others stayed close to the plant for the four months of the strike, eagerly discussing rotational casting. This odd detail, in its context, adds to the general aura of incredibility.

19. Molitor was shown in other respects to have a penchant for misstatements that cannot be deemed inadvertent. He swore, for example, that a machine allegedly used in his 1948 experiments had not been known to him at the time as a "Kaysam machine" (a matter of potential consequence in the case). Confronted with a prior contradiction of this in writing, he retracted it. He swore falsely in the Patent Office to having experience working with plastisols prior to his employment by defendant. Examples could be multiplied, but it is sufficient to note that this alleged inventor was a singularly unimpressive witness whose credibility was not enhanced when he protested that he was "confused," apologized for "appear[ing] so stupid," professed modesty about his ability to express himself when his explanations sounded particularly lame, and explained that the supposedly vital "progress reports" did not mean what they appeared simply to say.

20. The evidence showed that before this nocturnal drama Molitor had little day-to-day contact with the company president, reporting normally to people lower in the hierarchy.

21. This is not the only specific instance of false testimony by Smith. In an affidavit filed in this court to support a motion resisting *in personam* jurisdiction over defendant, he stated that Sun's only place of business was in Barberton, Ohio. The statement is now conceded to have been false. But it required an appeal from an order of dismissal to arrive at that concession. Another Smith affidavit denied the existence of a requirements contract with Goodrich. It has since been established that such a contract, negotiated by Smith, did in fact exist. The same affidavit denied, falsely, that defendant had ever licensed any company other than McNeil to make machines for Molitor's process—a denial that concealed a license with another company on which plaintiff predicates claimed antitrust violations. Other instances, cited by plaintiff, need not be recounted. It is recorded, however, that Smith's manner, his repeated mistakes and bland "correction" of them when they became apparent, and his tendency toward argumentative oratory—in addition to the substance of his inaccuracies—all comprised a chapter of the evidence which has proved hurtful to defendant's case.

(8) Though defendant retained regular patent counsel, it was over two years after the alleged conception before Molitor's application for a patent was filed.

(9) The Sixth Circuit mentioned Molitor reports of October 5, and December 6, 1948, to show that "on Molitor's orders a number of Mickey Mouse toys were made by a method which employed rotational casting." 274 F.2d at 233. There is nothing in these reports about rotational casting. The testimony purporting to tie them to this process, at least in this court, is untruthful.

*b. Legal consequences of defendant's false evidence*

Apart from its impact on the weight of the Sixth Circuit's decision as a precedent, the perjury committed in that Court and this one supplies independent grounds for refusing enforcement of defendant's patent against plaintiff. For reasons which have been outlined, this is not a case of isolated mistake or untruthfulness by a single witness. The picture is one of deliberately organized fabrication—with defendant's president, the alleged inventor, and the erstwhile laboratory chief combining to create a story which did not exist for the use of defendant's patent counsel as late as November of 1956.

■ As has been observed, defendant came here with the Sixth Circuit decision as a major weapon. For this reason alone, the exposure of the infection in that case would seem sufficient to defeat defendant's counterclaim under the closely apposite holding of Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933).

■ But there is a more direct and immediate basis for the same result. Whatever has happened elsewhere, an extensive pattern of fraud affecting a material issue has been spread and laid bare on this court's record. The counterclaim seeks equitable relief. The familiar principles leading to the conclusion of the preceding paragraph, summarized in the ancient but still profoundly meaningful doctrine of "unclean hands," would

apply even if there had never been a similar case in the Sixth Circuit. It is sufficient to defeat the counterclaim that defendant has in this very court transgressed the weighty "public policy against the assertion and enforcement of patent claims infected with fraud and perjury * * *." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 819, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945); see also Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Unless the courts are to sit as "mute and helpless victims of deception and fraud", the kind of "tampering" defendant has undertaken "with the administration of justice" (id. at 246, 64 S.Ct. at 1001) must, at a minimum, close the court's doors against an affirmative claim for equitable relief pressed by such means. Mas v. Coca-Cola Co., 163 F.2d 505 (4th Cir. 1947); Heath v. Frankel, 153 F.2d 369, 370–371 (9th Cir.), cert. denied, 328 U.S. 844, 66 S.Ct. 1025, 90 L.Ed. 1618 (1946); cf. Root Refining Co. v. Universal Oil Products Co., 169 F.2d 514, 534–535 (3d Cir. 1948), cert. denied, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949); Brantley v. Skeens, 105 U.S.App.D.C. 246, 266 F.2d 447, 452–453 (1959); Brinson v. Brinson, 334 F.2d 155, 159–160, 10 A.L.R.3d 795 (4th Cir. 1964).

*4. Plaintiff's remaining contentions as to validity*

While plaintiff has prevailed on three separate and independently sufficient grounds for holding the patent unenforceable in this case, both the parties and the appellate court are entitled to a determination at this level of plaintiff's alternative arguments for the same result. The court's findings and conclusions on these further issues are as follows:

■ a. Plaintiff argues that Molitor was guilty of "late claiming" in the course of the patent's prosecution, running afoul of the rule in Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). The contention is essentially

**504**

similar to one considered at some length, and found unmeritorious, in the Sixth Circuit. See 274 F.2d at 230–231. This court agrees with and follows that determination.

b. Plaintiff contends that the patent is invalid both because its teachings are insufficient and because they are excessively broad and vague. This point generates a bit of perplexity in light of plaintiff's successful claim of obviousness. If the court has erred on that issue, there may be substance in this one.

The evidence demonstrates, for example, that mere rotation "in a multiplicity of planes" (as Molitor vaguely described it) is not calculated to give the uniform wall thickness proclaimed by defendant as one of the patent's signal achievements. Molitor himself appears never to have achieved this result except with the simplest of spherical objects. Problems of mold wall thickness and configuration —wholly untouched by Molitor—require special handling beyond mere rotation, and modes of rotation must be experimentally tested if the claimed uniformity is actually to be achieved.

Defendant's answer is that these problems and their solution were all well known in the art, so that the claimed inadequacy of teaching is not a meritorious objection. Similarly, when plaintiff charges a failure to teach the necessity for molds completely sealed, defendant attacks this as silly, overlooking that the earlier work of Frank Stefanski (discussed above) is reported to have fallen short of Molitor for this reason alone.

The court agrees with defendant that Molitor's deficiencies were supplied by the knowledge of those skilled in the art. But this, the court has concluded, is true of the patent as a whole. Indeed, defendant's arguments in this aspect—excusing Molitor's vagueness or silence on matters at the heart of the alleged invention— tend to buttress the conclusion that there was nothing nonobvious anywhere in the patent.

The short of the present subject is this: if this court is mistaken in finding ob-

viousness, plaintiff's contention as to the insufficiency of the disclosures may warrant reexamination notwithstanding the acknowledged requirement of a full adjudication at this level to the extent possible. As the decision now stands, there is neither occasion nor meaningful basis for sustaining this one of plaintiff's alternative theories.

c. Plaintiff contends that Molitor swore falsely in the Patent Office when he claimed to be the sole inventor of the process. There is substantial evidence for this view—not the least of which is found in his appearance on the witness stand and the evasive, unpersuasive testimony he gave there, including apparent ignorance of things an inventor of his claimed process would be thought to have remembered even many years later (e. g., what an "axis" is and how things rotate about it). The contention is also supported by (1) the demonstrated falsity of Molitor's story as to when he conceived the process (April 1948), and (2) President Smith's story that Molitor was away at home during the supposedly seminal months after April 1948 (the strike period) while others stayed on to consider rotational casting.

Plaintiff has not succeeded, however, in proving its primary contention under this heading—that the invention actually came to Sun from people, primarily a Mr. Collins and the Viceroy Company, in Canada. Thus, as the record stands, assuming the process was an invention, it came out of Sun's laboratory, was promptly assigned to Sun, and could plausibly have been attributed by Sun to Molitor's work at some time or other even if others made suggestions or contributed incidentally in some respects. Considering all the circumstances, the court does not sustain plaintiff's alternative argument that Molitor's oath claiming sole inventorship should be held false and made a separate, additional ground for invalidating the patent. Cf. Agawam Company v. Jordan, 74 U.S. (7 Wall.) 583, 602–603, 19 L.Ed. 177 (1868); Pointer v. .Six Wheel Corporation, 177 F.2d 153, 157 (9th Cir. 1949), cert. denied, 339 U.S.

911, 70 S.Ct. 570, 94 L.Ed. 1338 (1950); Henry J. Kaiser Company v. McLouth Steel Corp., 257 F.Supp. 372, 406 (E.D. Mich.1966); Adams v. Columbus Manufacturing Co., 180 F.Supp. 921, 929 (M.D.Ga.1960); Becton-Dickinson Co. v. Robert P. Scherer Corp., 106 F.Supp. 665, 675 (E.D.Mich.1952), aff'd, 211 F.2d 835 (6th Cir. 1954).

 d. Plaintiff contends that the patent is invalid because an application for a similar Canadian patent was filed by defendant 51 rather than 60 days after the American filing. The legal issues thus raised have been thoroughly explored in an opinion of Judge Feinberg denying plaintiff's motion for summary judgment on this ground. 253 F.Supp. 12 (1966). That opinion left open, however, an opportunity for plaintiff to press the point at trial by attacking as a factual matter the Patent Commissioner's finding that the premature foreign filing was "inadvertent." See 253 F.Supp. at 22 n. 43.

The subject appeared on its face to pose potentially elaborate questions. For example, is the retroactive licensing, a matter seemingly confided to the Commissioner's discretion, reviewable at all? If so, what is the scope of review? Is the Commissioner's determination prima facie correct, final if based upon substantial evidence, or subject to the de novo finding of a district court?

As the case has developed, however, these interesting subjects may be left for another day. Plaintiff has failed to show anything but "inadvertence" to account for the solecism (a filing premature by nine days) of which it complains. Even if the matter be deemed open here for the court's independent determination, this highly technical attack upon the patent must be held unfounded.

### B. *Infringement*

 If defendant's patent were valid, there is no serious doubt that plaintiff would be an infringer. Attempting to fashion a shield from one of defendant's swords, plaintiff urges that Molitor's patent must be read as limited to a two-step operation for gelling and fusing.[22] If the problem were not essentially trivial, there might be substance in this contention. It is certainly true that Molitor's original (rejected) claims sounded more like a one-step heating process than those on which the patent finally issued. It is also true that at the Examiner's instance—very possibly to slide past a cited patent for rotationally casting latex—the Molitor claims were amended in the closing stages of the long struggle to insert deliberately and specifically the references to "additional" and "further" heating for fusion which have been considered earlier. This makes plausible at least the claim of "file wrapper estoppel" which is an elaboration of plaintiff's thesis that only two-step heating procedures could be held to infringe.

But the whole subject amounts in the end to a large quibble—generated, in fairness to plaintiff, by the patenting of a totally obvious procedure, however the well-known task of cooking was accomplished. Nevertheless, if the court's relative certainty on this score (as well as the other grounds of invalidity) should prove unfounded, it is recorded that plaintiff would then be an infringer of Molitor's process.[23]

### II. PLAINTIFF'S ANTITRUST AND UNFAIR COMPETITION CLAIMS

Under this broad heading plaintiff has asserted and attempted to prove a variety of claims. Despite their number and the earnestness with which they have been pressed, all have proved to be baseless in fact or in law or both. They merit only brief treatment here.

 A. As has been noted, the Goodrich Company took a license under the patent from defendant in 1953, and

---

22. It may be recalled that the court much earlier rejected defendant's claim to the supposedly unique, novel, and nonobvious idea of heating both to gel and fuse at the single (high) fusion temperature.

23. Plaintiff has some other "estoppel" arguments on this subject. They are without merit.

defendant, in a related and substantially contemporaneous contract, agreed to purchase 75% of its resins from Goodrich for a year. Plaintiff purports to find in this an unlawful "tying" agreement. The argument is scarcely intelligible. Plaintiff says further that the deal amounted to an illegal "rebate," but this thought is also difficult to follow and unmeritorious. The evidence on this subject diminishes the significance of the "tribute" defendant claims from Goodrich, but fails to make out the kind of unlawful exclusive dealing (or other antitrust violation) plaintiff has sought to establish. Cf. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

B. Plaintiff also charged that defendant had unlawfully conspired with machinery makers to restrict sales of rotational casting machines to licensees under the Molitor patent. Except for a brief and debatable contract expiring in 1955 between defendant and one machinery maker (from the existence of which plaintiff has shown no damage to itself), the evidence does not sustain, but serves to refute, this charge.

C. It is further alleged that defendant Sun effected an unlawful restraint by licensing bystander defendant Wonder Products Company (see footnote 1, supra) to use the Molitor process for hobby horses while denying this mode of use to other licensees. The argument is answered, as plaintiff substantially concedes, by General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, aff'd on rehearing, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938). Moreover, plaintiff's claim of injury from this asserted violation is wholly unsupported by the record.

D. There is a further charge that defendant engaged in unlawful "package licensing," requiring licensees to take (and pay for) rights under other and lesser patents as a condition of using the Molitor process. The evidence refutes the charge.

E. Equally unsubstantial is the argument that defendant committed an unlawful restraint when it sought and obtained from its licensees the promise of licenses from them under any patented improvements in the process. At least in the absence of antitrust violations not shown here, there is nothing wrong in this. Transparent-Wrap Machine Corp. v. Stokes Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563 (1947).

F. Plaintiff accuses defendant of other things asserted to have been unfair competitive practices. The accusations are so unsubstantial on their face—or so wholly devoid of evidentiary support—as to be frivolous.

III. CONCLUSIONS OF LAW SUMMARIZED

A. Defendant's patent, No. 2,639,134, is invalid under 35 U.S.C. § 103 because its "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

B. The patent is also invalid on the separate and independent ground of 35 U.S.C. § 102(b), because the invention was patented more than a year before the Molitor application in Italian Patent No. 440,295 (Delacoste).

C. The Molitor patent would, in any event, be unenforceable, and the counterclaim for enforcement must be dismissed, for the further, separate reason that both in the Sixth Circuit and here defendant has sought enforcement by means of deliberately fabricated evidence as to date of invention, with false testimony on this subject given by defendant's president, the alleged inventor, and the man who was defendant's chief chemist during the material times.

D. Plaintiff's other grounds for holding the patent invalid are not sustained.[24]

24. This summary should include, however, the court's contingent reservation on the question of allegedly vague and insufficient teachings, which would seemingly warrant further consideration if the conclusion as to obviousness is later found erroneous.

E. Assuming the patent in suit is valid, plaintiff has infringed it.

F. Plaintiff's antitrust and unfair competition claims are without merit.

One task remains before the formulation of a judgment based upon the foregoing findings and conclusions. Both parties have made claims for attorneys' fees. At the conclusion of the trial, since such claims would obviously be affected by the rulings on the issues now decided, it was agreed that the problem of counsel fees should be postponed pending such rulings. Accordingly, it is directed that the parties serve and file their post-trial submissions on this subject by December 6, 1967, and that any reply papers be served and filed by December 13, 1967.